**Reuben PALMER, et al., Subclass A Plaintiffs-Appellees,**

**and**

**Edward Negron, et al., Subclass B Plaintiffs-Appellees,**

**v.**

**CITY OF CHICAGO, Richard Brzeczek, Commander Milton Deas, and Richard M. Daley, et al., Defendants-Appellants.**

Nos. 83–1980, 83–1981.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1984.

Decided Feb. 15, 1985.

As Amended Feb. 20, 1985.

Rehearing and Rehearing In Banc Denied April 9, 1985.

Cudahy, Circuit Judge, dissented in part and concurred in part and filed opinion.

562

Michael E. Deutsch, Peoples Law Office, Chicago, Ill., for plaintiffs-appellees.

Henry A. Hauser, Terry L. McDonald, David S. Allen, Asst. State's Attys., Wm. Carlisle Herbert, Jeremiah Marsh, Hopkins & Sutter, Chicago, Ill., for defendants-appellants.

Before WOOD, CUDAHY, and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The City of Chicago and the County of Cook, Illinois appeal the entry of a preliminary injunction requiring the Chicago Police Department and the Cook County State's Attorney's Office to revamp their internal procedures for the recording, maintaining, and production of investigative files. We reverse and remand this case to the district court with instructions to limit the preliminary injunctive relief to the preservation of "street files" now in existence for criminal defendants convicted of felonies in the Cook County Circuit Court.

I

The record reveals that in May 1981, the Cook County State's Attorney's Office charged George Jones, an eighteen year old high school honor student, with the rape and first-degree murder of thirteen year old Sheila Pointer and the aggravated battery of Sheila's ten year old brother Purvey Pointer. Jones pled not guilty, and in preparation for trial, the defense counsel served four separate subpoenas upon the Recordkeeper of the Chicago Police Department ("CPD"). One subpoena, in particular, requested:

"Any and all police reports, arrest reports, photos, supplementary reports, witness statements, inventory slips, reports of the results and any scientific tests conducted on any physical evidence, or written memorandum of any kind concerning an incident that took place at 702 West 117th Street, Chicago, Ill. on May 4, 1981 wherein Purvey Pointer, Jr., was allegedly beaten and Sheila Pointer was killed."

In addition, the defense filed a motion for discovery with the Cook County State's Attorney's Office, asking that it produce, *inter alia:*

"Any material or information which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor, and any other material or information favorable to the accused which should be produced according to *Brady v. Maryland,* 3737 [sic] U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), and subsequent cases."

The defense counsel received oral assurances from the members of the CPD and the State's Attorney's Office that their respective offices had complied with the subpoenas and discovery request. The record reveals, however, that when the defense counsel subpoenaed Purvey Pointer's hospital record, he learned for the first time that on May 11, 1981, CPD officers Kelly and Binkowski had shown Purvey a picture of George Jones, while Purvey was confined in his hospital room. The following day, Purvey, while still confined, positively identified Jones as the assailant.[1] Upon discovery of this photo display, the defense counsel immediately filed another motion, requesting the complete production of "all statements, notes of interviews, memorandums, reports or written records of any kind regarding any and all interviews conducted of any person in connection with the investigation of this case." In response, the Cook County State's Attorney's Office transmitted a one-page memo obtained from the CPD's files, describing Purvey Pointer's reaction to the photograph of George Jones. According to the memo:

"The photo of George Jones was also shown to Purvy [sic] and when asked if he knew this person he said yes but gave no response when asked if he were [sic] the offender.... He kept trying to say

a last name but no one was able to ascertain what it was. It sounded like Anderson-Henderson-Harrison."

When Jones' murder trial commenced in April 1982, the prosecution expressed an intent to seek the death penalty for Jones. As the trial unfolded, the prosecution called Purvey Pointer to the witness stand and he positively identified George Jones as the assailant. This testimony concerning the identification of Jones appeared in the *Chicago Tribune* and caught the attention of Detective Frank Laverty, a member of the CPD's violent crimes unit who participated in the original investigation of the Sheila Pointer homicide. Purvey's testimony directly conflicted with Laverty's theory of the case, which he had presented to his supervisors in October 1981, that a Lester Pique was the assailant. After reading the newspaper article, Laverty immediately contacted the defense counsel and informed him that "he had written ... two reports— two separate memos on two separate occasions" concerning the investigation of Sheila Pointer's death. The defense counsel had not received either of these reports in response to the subpoenas served upon the CPD or the discovery motions filed with the Cook County State's Attorney's Office. As a result, the defense counsel not only subpoenaed the specific reports, but called Laverty to the witness stand and examined him in the presence of the state court judge.

Laverty related the content of one report in which Purvey Pointer stated, "George's name is George Anderson, ... he is the leader or a member of the 'Pirate' gang, because he wears the cap with the P on it, and ... he lurks in the vicinity of the Pullman School with other gang members." In the other report, Laverty asked Lester Pique, who had confessed to the murder and rape of a Sharon Hudson in July 1981, "if he was the offender in the Pointer

---

1. According to the testimony elicited at the preliminary injunction hearing, the hospital room identification consisted of George Jones (and his defense counsel who was present at all times) entering Purvey Pointer's hospital room, the CPD officers asking Pointer if Jones was the assailant, and Pointer responding, "No, that is not the man. No, no, no that is not the man." The officers then removed Jones' glasses, positioned Jones closer to Pointer's hospital bed, and Pointer responded, "Yes, no. Yes, no. Yes, no."

homicide and he stated that he might have been but that he blacked out and couldn't remember." Laverty's report further noted that according to lab tests, Pique's hair was "similar" to the hair samples found in the Pointer home and that Pique was able to accurately describe the lead pipe murder weapon used in the Pointer homicide. Based upon this information, Laverty's report concluded that Lester Pique "is the offender with a 2nd person in [the] Pointer homicide and that the person charged is a case of mistaken identity." Laverty presented this information to his commanding officers in October 1981, requesting that Pique be placed in a lineup, but the supervisors responded that "Purvey Pointer's condition would not be such that he could view a lineup...."

Following Laverty's testimony in the state trial court, the defense counsel served a subpoena on the Area 2 Watch Commander of the CPD,[2] this time requesting:

"Any and all record reports, supplementary reports, notes, memos and written reports, records of any kind, including but not limited to any watch investigator file or area # 2 file or area # 2 general files or reports concerning the Sheila Pointer homicide. R.D. # C–160031. Said homicide occurred on 5–4–81 at 702 W. 117th St., Chgo, Illinois."

In response, the CPD produced a "street file" consisting of additional memos not previously submitted to the defense counsel in response to their earlier subpoenas and discovery motions. In light of this

previously undiscovered evidence contained in the CPD's "street file," the state trial judge granted the defendant's motion for a mistrial and the Cook County State's Attorney's Office entered a plea of *nolle prosequi* (Lat: "will no further prosecute").[3]

On April 16, 1982, following the uncovering of the CPD's alleged practice in the Jones case—to maintain unofficial "street files" that were not transmitted to defendants in response to subpoenas or discovery requests—the plaintiffs filed a class action, civil rights lawsuit under 42 U.S.C. § 1983 against the City of Chicago and Cook County, Illinois.[4] The plaintiff class consisted of seven named plaintiffs in subclass A, in their individual capacity and on behalf of those similarly situated, that were "convicted [of felonies] after trial or plea of guilty in Cook County and sentenced to probation or imprisonment in the custody of the Illinois Department of Corrections."[5] The plaintiff class also included eleven named plaintiffs in subclass B who were "charged with felonies and awaiting trial in the Circuit Court of Cook County, Criminal Division." The plaintiffs alleged that the defendants, acting through the CPD and the Cook County State's Attorney's Office, were:

"continuing their policy and practices of concealing basic investigative working files, known as 'street files,' 'running files,' or 'office files,' in order to restrict and prevent the flow of exculpatory evidence to criminal defendants, in spite of

---

**2.** The CPD is divided into six areas and each area encompasses a separate geographical region of Chicago.

**3.** Detective Laverty testified that the CPD has commenced an internal disciplinary proceeding against him for failing to follow the "proper procedures and channels prior to testifying in court." We realize, of course, that the CPD must establish and enforce departmental guidelines that are applied equally to all members of the police force. In view of the evidence presented at the preliminary injunction hearing, however, it appears that Detective Laverty went above and beyond the call of duty, and properly upheld the highest ethical standards of the United States justice system, when he notified George Jones' defense counsel of the CPD's fail-

ure to fully investigate the case and turn over potentially exculpatory evidence. In the opinion of this court, the CPD should consider entering a commendation in Detective Laverty's personnel file for his adherence to the principles of honesty, decency, and justice.

**4.** The record reveals that the plaintiff class filed an original complaint on April 16, 1982, and an amended complaint on April 30, 1982.

**5.** The record reveals that this section 1983 lawsuit involves the investigation and prosecution of violent crime felonies within the Chicago area and that all subclass A plaintiffs have been convicted of felonies in the Cook County Circuit Court.

the Constitutional requirements of *Brady v. Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963) and the discovery rules of the Illinois Supreme Court (Ill.Rev.Stat. ch. 38, Sec. 110–A, S.Ct.Rules 412, *et seq.*)."

According to the plaintiffs' complaint:

"This intentional double file system maintained by the Defendants as a matter of policy violated the discovery rules of the Illinois Supreme Court, and, additionally, deprived the Plaintiffs and the sub-classes they represent of their rights to a fair trial and to be free from a deprivation of life, liberty and property without due process of law as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. Sec. 1983, *et seq.*"

The plaintiffs requested that the district court enter a declaratory judgment, finding that the defendants' alleged policy and practices violate the plaintiffs' due process rights under the Fifth and Fourteenth Amendments and their right to a fair trial under the Sixth and Fourteenth Amendments of the United States Constitution. In addition, the plaintiffs asked the district court to permanently:

"[e]njoin the policy and practice of Defendants of suppressing exculpatory and discoverable material through the maintenance of a double file system and manipulation of lab reports and illicit restrictions on police interviews, and order that all reports and memorandum be made part of one permanent file subject to proper discovery and production."

The plaintiffs further asked that the district court enter an order preserving the CPD's existing "street files" for future production in the plaintiffs' state court post-conviction actions and award damages to compensate the plaintiffs for their alleged injuries.

On April 20, 1982, some four days after the filing of the plaintiffs' complaint, Judge McMillen of the United States District Court for the Northern District of Illinois, granted the plaintiffs' request for a temporary restraining order. Judge McMillen ruled that the "[d]efendants ... shall preserve intact all police department investigative, office or working files, some known as 'street files,' together with all of the contents of such files, and all other papers and documents belonging in such files...." That same day, CPD Superintendent Richard Brzeczek issued a teletype order to all his commanding officers:

"Effective immediately, as a result of a temporary restraining order issued by federal district court judge Thomas R. McMillen, the contents of all police department investigative files known as office, unit, or working files and sometimes referred to as 'street or running' files will be kept intact. No documents, materials, or notes shall be removed from these files."

In addition, the CPD issued Detective Division Notice 82–2, which, by its express terms:

"mandates that all current unit investigative files be preserved intact.

prohibits the permanent removal, destruction, or alteration of any unit investigative report or file by any sworn or civilian member of the Department.

establishes procedures for Detective Division members to insure unit investigative files are properly preserved and controlled."

Although the CPD complied with the court's order and preserved the "street files" in existence at the time of the temporary restraining order, the evidence revealed that detectives were considering certain notes and "to-from" memos, drafted in cases still under investigation, "as their personal property ... and therefore as outside the preservation requirements of Notice 82–2." *Palmer v. City of Chicago,* 562 F.Supp. 1067, 1072 (N.D.Ill.1983). As a result, on September 27, 1982, Judge McMillen amended the temporary restraining order and directed that "the defendants ... shall preserve intact all police investigative, office or working files, some known as 'street files,' together with all of the contents of such files, *and all other pa-*

*pers and documents formally put in such files....*" (Emphasis added.)

The following day, September 28, 1982, Judge McMillen withdrew from the case due to a docketing conflict and the case was reassigned to Judge Shadur who scheduled a hearing on the plaintiffs' motion for a preliminary injunction.[6] The plaintiffs requested that the district court grant preliminary injunctive relief:

> "restraining the Defendants from continuing the policy and practice of maintaining and using separate, confidential police investigative files, sometimes known as 'street files,' for the purpose of withholding or inhibiting the flow of reports, documents and other materials which are exculpatory or otherwise useful or favorable to the Defendants in criminal cases in Cook County; and directing preservation, inventory and production where necessary of all such investigative or 'street files.'"

In sum, the plaintiffs sought preliminary injunctive relief to (a) prevent the defendants from continuing their alleged practice of withholding exculpatory evidence contained in "street files"; and (b) preserve all existing "street files." A six-day evidentiary hearing was conducted in the district court and based upon the evidence presented, Judge Shadur found that the detectives within the CPD's violent crimes unit "record the results of their investigations in documents that may be classified in two categories, 'Unofficial Reports' and 'Official Reports.'" *Id.* at 1069. According to the court, the unofficial reports consist of detectives' notes, typewritten witness statements or interviews, and major crime incident work sheets, all prepared contemporaneous with the detectives' obtaining of the information. These unofficial reports are commonly referred to as "street files," "running files," or "office files." In con-

trast, the official reports consist of "standardized incident, opening, supplementary and closing reports" that are typed, marked with the Record Division number assigned to the investigation, and subsequently transmitted to the CPD's Record Division headquarters. *Id.* at 1070.

At the preliminary injunction hearing, the City of Chicago contended that:

> "The *policy* of the Chicago Police Department has been that all official reports prepared in accord with a violent felony investigation must be complete and accurate; that is, such reports must contain all information known to the preparer(s) which pertains to the offense or to the person(s) accused thereof."

*Id.* (emphasis added). Detective James Hickey, assistant to the Chief of Detectives of the CPD, testified, however, that "it is the detective's discretion to prepare [an official] supplemental report" in the first instance. Detective Hickey further acknowledged that following issuance of the temporary restraining order and his study of CPD procedures, "[t]here was agreement [among CPD officials] that too much substantive investigative activity was not being placed in [official] supplemental reports." Officer John Stibich, commander of the CPD's Area 3, added that the CPD had no formal guidelines to assist detectives in determining pertinent information and "[w]hat's pertinent to one [detective] might not be to another." For example, Officer Milton Deas, commander of the CPD's Area 2, testified that the information in the Jones' case concerning Purvey Pointer's mention of a last name like "Anderson, Henderson, Harrison" should not be placed in an official report until "[c]hecking out to ascertain that those names were actually the offender that was referred to by the victim." Officer Deas

---

**6.** On October 24, 1982, Judge Shadur granted Cook County's motion to dismiss the Cook County State's Attorney's Office, ruling that it was not a proper entity for purposes of 42 U.S.C. § 1983. Judge Shadur also granted the County's motion to dismiss the damage claim against the prosecutors named in the plaintiffs' amended complaint, as they were acting within

their official capacity as employees of the Cook County State's Attorney's Office. Similarly, Judge Shadur dismissed the Chicago Police Department because of its nonentity status for purposes of a section 1983 lawsuit. *See Palmer v. City of Chicago,* 562 F.Supp. 1067, 1068 n. 1 (N.D.Ill.1983). The plaintiffs have not appealed these rulings.

further claimed that Purvey Pointer's statement "George's name is George Anderson ... he is a leader or member of the 'Pirate' gang because he wears a cap with a P on it ... need not be put in [an official] supplemental report." Based upon the testimony and admissions of the CPD officers, the district court found that despite the CPD's policy of requiring official reports to contain all information that pertains to a case, the detectives exercised their discretion in determining what information to place in the formal, official report on file at the CPD's Record Division headquarters.

The evidence presented at the evidentiary hearing further revealed that the usual practice among criminal defendants in Cook County Circuit Court was to obtain investigative information from the CPD by serving a subpoena upon the Recordkeeper of the CPD or filing a motion for discovery with the Cook County State's Attorney's Office. The district court found that the CPD responded to subpoena requests for " 'any and all' documents ..." by producing "only the Official Reports maintained at Police Headquarters, ... and not ... the Unofficial Reports maintained at Area detective facilities or in the possession of an individual detective...." *Id.* at 1071. The court further found that "[i]n response to a defendant's discovery motion, trial assistants in the [Cook County] State's Attorney's Office simply ordered by telephone the Official Reports maintained at the [CPD's] Central Records Division." *Id.* at 1072. The plaintiffs referred to specific instances where the unofficial reports had not been transferred to criminal defendants in response to their subpoenas and/or discovery motions. For example, the defense counsel for Glen Baker, who was charged with the murder of a Jesse Seay in June 1980, served a subpoena upon the CPD requesting "any and all police reports contained in RD # B190808; include six (6) photos under INV. # 725469." At trial, the defense counsel discovered for the first time that an unofficial "street file" was retained in a CPD officer's investigative file but not forwarded in response to the subpoena. According to the report, compiled by a Detective Porter, an eyewitness named Darryl:

> "observed 'Dino' walk from the [south-side] of the building. He was carrying a rifle that had a red scarf around the butt. Darryl says that nothing was said and that he then heard one shot and saw the victim fall to the ground between him and MARSHALL ... Darryl is emphatic that the offender in this shooting is 'Dino' Anthony WILLIAMS, and not BAKER, as said by MARSHALL."

Following disclosure of this exculpatory, eyewitness identification, the defense counsel requested a mistrial. The state court judge denied the motion, but after the jury returned a verdict of guilty against Baker, the defense counsel immediately moved for and received a new trial. At the close of the new trial, the judge sustained a motion for a directed verdict, finding Baker not guilty in the murder of Jesse Seay.

At the preliminary injunction hearing, CPD Commander Deas testified that he interpreted the amended temporary restraining order and Detective Division Notice 82–2 to permit the destruction of detectives' notes and "to-from" memos on the theory that such writings constituted the detective's personal property. CPD Superintendent Richard Brzeczek refuted this logic with testimony that his:

> "interpretation of the TRO and 82–2, and the intent of 82–2 in terms of implementing the TRO, is that every document, regardless of its nature, official or unofficial, formal or informal, piece of paper, notebook, back of a matchbook, or what have you becomes part of the investigative file."

Superintendent Brzeczek added that to destroy notes as personal property would be in violation of the TRO because the order eliminates the distinction between the departmental property and personal property. In addition, Deputy State's Attorney William Kunkle testified that the maintenance of all police investigative documents at the CPD's Record Division headquarters would assist the Cook County State's Attorney's Office in responding to criminal defend-

ants' discovery requests. The evidence presented at the preliminary injunction hearing further revealed that some 300 "street files" remained in existence at the various CPD stations, and that all such files in existence at, and since, the time of the temporary restraining order had been preserved.

In response to the forthright testimony of Superintendent Brzeczek and Deputy State's Attorney Kunkle, the CPD, on January 13, 1983, issued Detective Division Special Order 83-1, effective February 3, 1983. *See id.* at 1078-80. The CPD's Special Order 83-1 provides in relevant part that:

> "It is the policy of the Chicago Police Department to conduct all criminal investigations in an impartial and objective manner and to maintain the integrity of its investigative files to ensure that the due process rights of the accused are not compromised during the subject investigation, initial court hearing or any subsequent reviews. Additionally, it is the policy of the Chicago Police Department to record and preserve *any* relevant information obtained by *any* detective during the course of a violent crime field investigation.
>
> When assigned to violent crime field investigations, detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any information and materials that may tend to show his possible innocence or aid in his defense is preserved."

*Id.* at 1078 (emphasis original). To accomplish this objective of recording and maintaining all relevant investigatory information, the CPD's Special Order 83-1 requires that an Investigative File Case Folder be opened in all cases involving homicides, police-related shooting incidents, batteries likely to result in death, rapes and deviate sexual assaults, and any other major violent crime field investigation the unit supervisor deems appropriate. The Investigative File is defined as "a criminal case file pertaining to a violent crime field investigation which contains official Department reports, notes, memoranda and miscellaneous documents generated by or received by any detective during the course of such investigation." *Id.* at 1079. Special Order 83-1 provides that any document placed in the Investigative File Case Folder be logged on an Investigative File Inventory Sheet which is forwarded to the CPD's Record Division headquarters to ensure that "proper notice of all existing documents pertaining to the subject investigation can be made to the State's Attorney's Office, the courts and the defense counsel." *Id.* The CPD's Special Order 83-1 further mandates that detectives "preserve all handwritten notes and investigative documents generated or received and submit them to the unit supervisor with each supplementary report submitted whenever an Investigative File Case Folder *has not been* initiated." *Id.* at 1080 (emphasis original).

The district court judge adopted the CPD's Special Order 83-1, *in toto*, as a form of preliminary injunctive relief. Judge Shadur then saw fit to add his own amendments to the Special Order, requiring, *inter alia*, that the CPD: open an Investigative File Case Folder in *all* violent crime field investigations; take and maintain complete notes of all relevant matters during the course of an investigation; direct any detective who receives information relating to a violent crime investigation that is not assigned to him, to forward such information to the detective in charge of the case; transmit two copies of the Investigative File Inventory Sheet to the Office of Legal Affairs of the Department or the Cook County State's Attorney's Office, whenever a subpoena or a discovery motion is received, in order that one copy be transmitted to the defendant's counsel; and assure that the CPD's Training Division develop a program to educate detectives in the new procedures. *Id.* at 1080-82. Moreover, Judge Shadur required, *inter alia,* that the Cook County State's Attorney's Office, when presented with a dis-

covery motion from a criminal defendant: provide the defendant with a copy of the Inventory File Case Sheet; provide the defendant with police writings that are discoverable and notice of those documents that the State Attorney's Office claims are not discoverable; and assure that no police writings have been withheld from the State's Attorney's Office. *Id.* at 1082. The preliminary injunctive relief addressed only the restructuring of the CPD's procedures for transcribing and maintaining investigative records. Judge Shadur did not adopt the terms of the amended temporary restraining order nor did he require that the CPD continue to preserve the "street files" in existence at the time this lawsuit was filed. On appeal, the City of Chicago and Cook County, Illinois contend that the district court erred in granting the plaintiffs' motion for a preliminary injunction.

## II

### A. CASE OR CONTROVERSY

The plaintiff class filed this lawsuit under 42 U.S.C. § 1983, claiming that the actions of the defendants (City of Chicago and Cook County, Illinois) deprived the class members of their due process rights under the Fifth and Fourteenth Amendments and their right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution.[7] According to the plaintiffs, the City and County defendants' alleged practice of withholding exculpatory evidence contained in "street files" violates the Supreme Court's holding in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. At the outset, we note that this lawsuit remains in the pretrial stage and no evidence has been presented as to the legal merits of the plaintiffs' section 1983 lawsuit. The only issue addressed in the district court, and thus the only issue before this court on appeal, is whether principles of equity require that a preliminary injunction be issued:

> "restraining the defendants from continuing the policy and practice of maintaining and using separate, confidential police investigative files, sometimes known as 'street files,' for the purpose of withholding or inhibiting the flow of reports, documents and other materials which are exculpatory ... and directing preservation, inventory and production where necessary of all such investigative or 'street files.' "

The express purpose of the plaintiffs' request for preliminary injunctive relief is two-fold: (a) to restrain the defendants from continuing their alleged practice of concealing exculpatory evidence contained in "street files"; and (b) to preserve the existing "street files," in order that the plaintiffs can meaningfully proceed with their post-conviction remedies and felony trials in Illinois state court, as well as their attempt under section 1983, to obtain a declaratory judgment, a permanent injunction, and damages.

The City and County defendants initially contend that the district court's grant of preliminary injunctive relief in this section 1983 lawsuit was improper as the court lacked subject matter jurisdiction. According to the defendants, the named plaintiffs failed to establish the jurisdictional require-

---

**7.** The district court certified the plaintiff class, consisting of the A and B subclasses, under Fed.R.Civ.P. 23(b)(2). The court ruled that the members of the class are so numerous that joinder is impracticable; that there exist questions of law and fact common to each subclass; that the named plaintiffs have claims typical of the subclass members; that the plaintiffs' counsel fairly protect the subclass members' interests; and that the defendants' alleged actions

are generally applicable to the entire class. *See Palmer v. City of Chicago,* 562 F.Supp. at 1075–76. The City of Chicago and the County of Cook, Illinois do not contest this class certification on appeal, and thus the propriety of the district court's ruling is not an issue before this court for review. *See Rizzo v. Goode,* 423 U.S. 362, 373 n. 7, 96 S.Ct. 598, 605 n. 7, 46 L.Ed.2d 561 (1976).

ment of a case or controversy as set forth in Article III of the United States Constitution. Indeed, it is a basic tenet of Federal law that "the judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.'" *Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). The defendants maintain that the plaintiffs' claims for preliminary injunctive relief are founded upon mere speculation, especially in view of the fact that no plaintiff proved "a single instance in which named defendants violated the constitutional rights of the named plaintiffs." Thus, the defendants argue that the named plaintiffs have not demonstrated a "'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 1664, 75 L.Ed.2d 675 (1983) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)) ("*Lyons*"). *See also O'Shea v. Littleton*, 414 U.S. 488, 493–94, 94 S.Ct. 669, 674–75, 38 L.Ed.2d 674 (1974) ("*O'Shea*"). The defendants add that "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy, *none may seek relief on behalf of himself or any other member of the class.*" *O'Shea*, 414 U.S. at 494, 94 S.Ct. at 675 (emphasis added) (citing *Bailey v. Patterson*, 369 U.S. 31, 32–33, 82 S.Ct. 549, 550–51, 7 L.Ed.2d 512 (1962)). In effect, the defendants claim that the named plaintiffs failed to establish standing, and thus the district court lacked jurisdiction to grant preliminary injunctive relief in this section 1983 lawsuit.

According to the Supreme Court in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975):

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. In both dimensions it is founded in concern about the proper—and properly limited—role of the court in a democratic society."

422 U.S. at 498, 95 S.Ct. at 2204 (citations omitted). *See also Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *HOPE, Inc. v. County of DuPage, Ill.*, 738 F.2d 797, 803 (7th Cir.1984) (*en banc*) ("*HOPE*"). In order to satisfy the jurisdictional prerequisite of standing:

"Abstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate' not 'conjectural' or 'hypothetical.'"

*Lyons*, 461 U.S. at 101–02, 103 S.Ct. at 1664–65; *O'Shea*, 414 U.S. at 494, 94 S.Ct. at 675. Moreover:

"*That a suit may be a class action ... adds nothing to the question of standing,* for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'"

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 1925 n. 20, 48 L.Ed.2d 450 (1976) (emphasis added) (quoting *Warth v. Seldin*, 422 U.S. at 502, 95 S.Ct. at 2207). *See also HOPE*, 738 F.2d at 804–05. Thus, as this court stated in *HOPE*, when considering the issue of standing, "the focus is on the plaintiff and whether he or she has alleged and proven facts necessary to meet the minimum constitutional requirements of standing." 738 F.2d at 804 (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. at 38, 96 S.Ct. at 1924).

In the present case, the plaintiffs' amended complaint alleges that:

"Plaintiffs in sub-class A have been directly harmed by the operation of Defendants' policy of maintaining investiga-

tive or 'street files.' Exculpatory or other discoverable materials requested by their defense counsel which Plaintiffs were entitled to have produced were suppressed by the Defendants, and Plaintiffs were thereby deprived of fair trials.

Plaintiffs in sub-class B have been directly harmed by the operation of Defendants' policy of maintaining investigative or 'street files.' Despite appropriate discovery requests made by their defense counsel they have not received exculpatory and other discoverable material necessary and relevant to preparing their defense at trial."

At the preliminary injunction hearing, the plaintiffs failed to demonstrate that the defendants' alleged practice of withholding exculpatory evidence contained in "street files" actually deprived any of the named plaintiffs of their constitutional rights. Rather, the plaintiffs' evidence centered upon the defendants' actions in concealing material, exculpatory evidence from non-class members such as George Jones and Glen Baker, neither of whom was convicted of a felony in the Cook County Circuit Court. The plaintiffs claim that if material, exculpatory evidence was withheld in the Jones and Baker felony murder cases, then it is reasonable to assume that similar evidence was withheld in other felony cases, including those involving the named plaintiffs.[8] The City and County defendants respond that the plaintiffs' inability to make the essential causal link and prove a specific instance of withholding or concealing material, exculpatory evidence from a named plaintiff leaves the entire class without standing.

We initially address the standing of the subclass A plaintiffs (convicted of felonies in the Cook County Circuit Court) to request the first portion of preliminary injunctive relief—restraining the defendants' alleged practice of withholding exculpatory evidence contained in "street files." Ac-

cording to the allegations of the amended complaint, the defendants' alleged withholding of exculpatory evidence has harmed the subclass A plaintiffs by depriving them of their constitutional rights of due process and a fair trial. It is clear that the complaint focuses solely on this past harm and there is no claim that the defendants' alleged practice continues to impose harm upon the plaintiffs, in the form of an unlawful sentence. Indeed, if the subclass A plaintiffs claimed such a continuing harm, their section 1983 lawsuit would be barred and habeas corpus relief would be their exclusive Federal remedy. *See Preiser v. Rodriguez*, 411 U.S. 475, 500, 93 S.Ct. 1827, 1841, 36 L.Ed.2d 439 (1973). *See also O'Shea*, 414 U.S. at 496, 94 S.Ct. at 676.

■ The Supreme Court has established that the mere allegation of "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 495–96, 94 S.Ct. at 675–76. *See also Lyons*, 461 U.S. at 102, 103 S.Ct. at 1665; *Rizzo v. Goode*, 423 U.S. 362, 372, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976) (*"Rizzo"*). Though "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," a plaintiff's standing must be premised upon more than hypothetical speculation and conjecture that harm will occur in the future. *O'Shea*, 414 U.S. at 496, 94 S.Ct. at 676. *See also Lyons*, 461 U.S. at 102, 103 S.Ct. at 1665; *Rizzo*, 423 U.S. at 372. In *Lyons*, the plaintiff brought a section 1983 lawsuit against the Los Angeles Police Department, alleging that an officer of the Department placed him in an unlawful chokehold, "rendering him unconscious and causing damage to his larynx." 461 U.S. at 98, 103 S.Ct. at 1663. The plaintiff sought, *inter alia*, a preliminary injunction barring

---

**8.** The plaintiffs introduced exhibits at the preliminary injunction hearing containing the official and unofficial reports for the subclass A named plaintiff Keith Sykes and the subclass B named plaintiffs Marcus Carr and Richard Hill-

son. Our review of the record reveals, however, that no testimony was elicited concerning the withholding of exculpatory evidence contained in these named plaintiffs' unofficial "street files."

the use of chokeholds by the Los Angeles Police Department. The Supreme Court reasoned that "Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of chokeholds by police officers." *Id.* at 105, 103 S.Ct. at 1666. According to the court, "[t]here was no finding that Lyons faced a real and immediate threat of again being illegally choked," the threat of future injury was mere speculation and conjecture, and thus Lyons lacked standing to seek injunctive relief in Federal court. *Id.* at 110, 103 S.Ct. at 1669.

■ In the present case, the subclass A plaintiffs allege only a past harm. Thus, according to the Supreme Court's rationale in *Lyons*, as well as *Rizzo* and *O'Shea*, the plaintiffs' standing to request that the district court issue a preliminary injunction restraining the defendants' alleged practice of withholding exculpatory evidence contained in "street files," depends solely upon the likelihood that the plaintiffs will suffer future injury from the defendants' alleged practice. It is nothing but sheer speculation that a member of the subclass A plaintiffs will, at some later date, be charged with a felony offense by the Cook County State's Attorney's Office, that he will properly draft and file a specific subpoena and/or discovery motion, and that the defendants will withhold exculpatory evidence contained in a "street file." [9] The conjectural and speculative nature of such a claim is further evidenced by the fact that the subclass A plaintiffs neither alleged a risk of future injury nor introduced evidence to adequately support such a claim. Accordingly, we hold that upon review of the amended complaint and the evidence presented at the preliminary injunction hearing, no case or controversy exists with respect to the subclass A plaintiffs' claim for the first portion of preliminary injunctive relief—restraining the defendants' alleged practice of withholding exculpatory evidence contained in "street files."

We turn next to the subclass A plaintiffs' claim for the second portion of preliminary injunctive relief—preserving the "street files" now in existence for members of the subclass. The amended complaint alleges that during the subclass A plaintiffs' felony trials in Cook County Circuit Court, "their defense counsel made appropriate discovery requests pursuant to *Brady v. Maryland* and [Illinois] Supreme Court Rules 412, *et seq.*" According to the evidence presented at the preliminary injunction hearing, the plaintiffs' defense counsel filed general subpoenas and discovery motions asking for "any and all documents...." The amended complaint further alleges that in response to these general subpoenas and discovery motions, the defendants withheld "street files" containing exculpatory evidence. In support of this claim, the plaintiffs elicited testimony that the defendants concealed unofficial "street files" containing exculpatory evidence in the felony murder trials of George Jones and Glen Baker.[10] The lack of any such evidence concerning the named plaintiffs presumably stems from the fact that the "street files" are in the defendants' possession. The record reveals that the named plaintiffs had an opportunity to view only eighteen unofficial "street files" before the commencement of the preliminary injunction hearing. At the hearing, the CPD admitted that over 300 such files remain in existence.

■ The defendants contend that the subclass A plaintiffs lack standing to obtain preservation of the "street files" because there has been no showing that the CPD or the Cook County State's Attorney's Office withheld a "street file" containing

---

9. We note that when considering the likelihood that the subclass A plaintiffs will suffer future harm from the defendants' alleged practice of withholding exculpatory evidence contained in "street files," "[w]e must assume that [the plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction as well

as exposure to the challenged course of conduct said to be followed by [the defendants]." *O'Shea,* 414 U.S. at 497, 94 S.Ct. at 676. *See also Lyons,* 461 U.S. at 103, 103 S.Ct. at 1665.

10. See supra note 8.

exculpatory evidence from any subclass A plaintiff. The defendants' argument lacks merit. We initially note that the plaintiffs' section 1983 lawsuit has progressed only as far as the preliminary injunction stage. The parties have not addressed the legal merits of this case nor the alleged due process violations for which the plaintiffs request a declaratory judgment, permanent injunctive relief, and damages. As a result, the subclass A plaintiffs have had only a limited opportunity to discover the information contained in their "street files." Moreover, the record reveals that the City defendants have responded to the plaintiffs' requests for access to existing "street files" by tersely stating that "[s]aid material is not relevant for the plaintiffs' case except to the extent that such files exist." The defendants cannot argue on one hand that the plaintiffs have failed to prove injury and, on the other hand, that the plaintiffs are not entitled to the very evidence that is essential in proving that injury. Given the unique situation presented in this case, where the plaintiffs' evidence is in the exclusive possession of the defendants, the subclass A plaintiffs, at best, can only allege injury resulting from the defendants' conduct. The plaintiffs must await production and review of the actual "street files" until they can introduce evidence to prove their allegations of harm. It is clear that the subclass A plaintiffs will have no meaningful opportunity to prove their allegations unless the existing "street files" are preserved and the plaintiffs are permitted access to those files. Accordingly, we hold that at this pretrial stage of the proceeding, the subclass A plaintiffs have alleged sufficient harm to establish standing for their requested preliminary injunctive relief to preserve the "street files" that exist for criminal defendants convicted of felonies in the Circuit Court of Cook County.

■ We add that once a subclass A plaintiff has properly drafted a specific subpoena, served that subpoena upon the CPD, and has viewed his "street file," the plaintiff is then required to introduce the quantum of proof necessary to support his allegations of constitutional violations, in order to maintain standing. If the plaintiff is unable to satisfy this burden, he will be dismissed from the section 1983 lawsuit and unable to pursue his claim for damages in Federal court. We further add that the preservation of "street files" that exist for criminal defendants convicted of felonies in Cook County Circuit Court is not a challenge to the "fact or duration of [the plaintiffs'] physical imprisonment" and thus the subclass A plaintiffs, many presently serving prison terms in Illinois state prisons, may pursue their equitable remedy under section 1983. *Preiser v. Rodriguez*, 411 U.S. at 500, 93 S.Ct. at 1841. *See also Gerstein v. Pugh*, 420 U.S. 103, 107 n. 6, 95 S.Ct. 854, 859 n. 6, 43 L.Ed.2d 54 (1975). It is clear, however, that once a subclass A plaintiff obtains the evidence in his "street file" and begins an attack upon the fact or duration of his imprisonment, then his exclusive remedy in Federal court is habeas corpus relief. *Preiser v. Rodriguez*, 411 U.S. at 500, 93 S.Ct. at 1841. In view of the requirement that Federal habeas petitioners must exhaust their state court remedies, the subclass A plaintiffs must initially litigate their constitutional claims in the Illinois state court system.

■ We next consider the claims for preliminary injunctive relief made by the subclass B plaintiffs, those individuals "charged with felonies and awaiting trial in the Circuit Court of Cook County, Criminal Division." It is immediately apparent that the members of this subclass are presently involved in state court criminal trial proceedings. A preliminary issue that arises is whether a Federal court can interfere with an ongoing state criminal proceeding and issue preliminary injunctive relief to restrain the defendants' alleged practice of withholding exculpatory evidence contained in "street files" and to preserve those "street files" in existence. The Supreme Court has recognized a "longstanding public policy against federal court interference with state court proceedings," especially ongoing state criminal proceedings. *Younger v. Harris*, 401 U.S. 37, 43, 91

**574**

S.Ct. 746, 750, 27 L.Ed.2d 669 (1971) ("*Younger*"). According to the court, "the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury which is both great and immediate." *Lyons*, 461 U.S. at 112, 103 S.Ct. at 1670. *See also O'Shea*, 414 U.S. at 499, 94 S.Ct. at 677; *Younger*, 401 U.S. at 46, 91 S.Ct. at 751. The fundamental purpose for restraining Federal equity jurisdiction is to "avoid a duplication of legal proceedings and legal sanctions where a single suit would be adequate to protect the rights asserted." *Younger*, 401 U.S. at 44, 91 S.Ct. at 750. The Court adds that:

> "[t]his underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways."

*Id.* Thus, "[i]n exercising their equitable powers federal courts must recognize '[t]he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Lyons*, 461 U.S. at 112, 103 S.Ct. at 1670 (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed.2d 138 (1951)). *See also O'Shea*, 414 U.S. at 500, 94 S.Ct. at 678.

 In the present case, the subclass B plaintiffs have been formally charged with felonies and are awaiting or proceeding with trials in the Cook County Circuit Court. Despite these pending criminal trials in the Illinois state court system, the subclass B plaintiffs have filed a section 1983 civil rights lawsuit in Federal court claiming that the CPD and the Cook County State's Attorney's Office are violating their constitutional rights by allegedly withholding exculpatory evidence contained in "street files." A review of the relevant case law reveals that criminal defendants, upon request, have a constitutional right to receive evidence that is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) ("*Brady*"). *See also Ruiz v. Cady*, 710 F.2d 1214, 1216 (7th Cir.1983). According to the Supreme Court, if the criminal defendant makes a specific and relevant request for evidence and "the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond [and] ... the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976). In contrast, if the criminal defendant makes a general request, (i.e. "any and all documents ...") the prosecutor need only turn over evidence that, if omitted, would create "a reasonable doubt [about the defendants' guilt] that did not otherwise exist ... [as] evaluated in the context of the entire record." *Id.* at 112, 96 S.Ct. at 2401. *See also Ruiz v. Cady*, 710 F.2d at 1216. The Supreme Court has further established that the constitutional duty imposed upon States to preserve evidence, is "limited to evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, — U.S. —, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984) ("*Trombetta*"). Indeed, the "evidence must both possess an exculpatory value that was apparent ... and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* The Supreme Court has added that the destruction of investigatory notes does not rise to the level of a constitutional violation "[i]f the ... notes ... were made only for the purpose of transferring the data thereon ..., and if, after having served that purpose, they were destroyed ... in good faith and in accord with

... normal practice...." *Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 308, 7 L.Ed.2d 256 (1961). *See also Trombetta*, 104 S.Ct. at 2533.

At a constitutional minimum, the State must forward material exculpatory evidence to criminal defendants upon receipt of a properly drafted request and preserve evidence that possesses an apparent exculpatory value. It is clear that the subclass B plaintiffs, as criminal defendants in pending felony proceedings in the Cook County Circuit Court, are presently able to file motions to compel production and preservation of evidence with the state court trial judge. If the criminal defendant believes that the CPD and the Cook County State's Attorney's Office are failing to comply with these motions, the defendant may present this evidence to the state trial judge. Moreover, the criminal defendant is free to claim constitutional violations under *Brady* and/or *Trombetta* and contest these alleged violations in the Illinois state court. *See, e.g., Moore v. Sims*, 442 U.S. 415, 425, 99 S.Ct. 2371, 2378, 60 L.Ed.2d 994 (1979); *Perez v. Ledesma*, 401 U.S. 82, 85 (1971).[11]

The Supreme Court recognized in *Kugler v. Helfant*, 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975), that:

"The policy of equitable restraint expressed in *Younger v. Harris*, in short, is founded on the premise that ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights. *See Steffel v. Thompson*, 415 U.S. 452, 460 [94 S.Ct. 1209, 1216, 39 L.Ed.2d 505]. Only if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process."

421 U.S. at 124, 95 S.Ct. at 1530. *See also Younger*, 401 U.S. at 54, 91 S.Ct. at 755 (no showing of "bad faith, harassment, or any other unusual circumstance that would call for equitable relief"). In the present case, the subclass B plaintiffs have failed to establish the "extraordinary circumstances" that would prevent the Illinois state court from adjudicating their alleged constitutional violations. The plaintiffs merely claim that the defendants have acted in "bad faith" in allegedly withholding exculpatory evidence contained in "street files" and that this, in and of itself, constitutes a sufficient "extraordinary circumstance" to grant equitable relief. We disagree. The subclass B plaintiffs have presented this court with no constitutional violation that the state court is "incapable of fairly and fully adjudicating." Clearly, if we were to issue a preliminary injunction restraining the defendants from maintaining "street files" or requiring the defendants to preserve all investigatory notes and memos traditionally placed in "street files," we would expose the plaintiffs' ongoing "criminal prosecution[s] to insupportable disruption." *Stefanelli v. Minard*, 342 U.S. at 123, 72 S.Ct. at 121. A grant of preliminary injunctive relief to the subclass B plaintiffs would presumably allow any class member to enter the Federal court during the course of his state felony trial and allege that the Cook County State's Attorney's Office, as well as the CPD, violated the preliminary injunction by withholding exculpatory evidence or failing to preserve exculpatory evidence contained within a "street file." This opening of the proverbial "Pandora's box" would subject every felony trial prosecuted in the Cook County Circuit Court system to the time-consuming scrutiny of the Federal district court. The effect would be to stay, disrupt, unduly delay, and interfere with state criminal proceedings while the subclass B

---

11. The subclass B plaintiffs have a more than ample opportunity to raise their constitutional claims in their pending state court criminal proceedings and thus this case is easily distinguishable from *Gerstein v. Pugh*, 420 U.S. at 108 n. 9, 95 S.Ct. at 860 n. 9, where the defendant could not raise the issue of an alleged unconstitutional pretrial detainment in the state court. *See also Middlesex Ethics Comm. v. Garden State Bar Assn.*, 457 U.S. 423, 436 n. 14, 102 S.Ct. 2515, 2523 n. 14, 73 L.Ed.2d 116 (1982); *Juidice v. Vail*, 430 U.S. 327, 336–37, 97 S.Ct. 1211, 1217–18, 51 L.Ed.2d 376 (1977).

plaintiffs litigated each and every claim of alleged constitutional violation in Federal court. Furthermore, it is conceivable that any adverse decision would be appealed to this court and the net result would be additional undue delay and disruption in the state criminal proceeding as well as frustration of the State's desired goal to attain justice for the citizens of Illinois. Presented with this very same dilemma, the Supreme Court in *O'Shea* stated that:

"Apart from the inherent difficulties in defining the proper standard against which such claims might be measured, and the significant problems of proving noncompliance in individual cases, such a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings is in sharp conflict with the principles of equitable restraint which this Court has recognized in the decisions previously noted."

414 U.S. at 502, 94 S.Ct. at 679. *See also Stefanelli v. Minard,* 342 U.S. at 123, 72 S.Ct. at 121.

We further note that if we were to grant the subclass B plaintiffs' requested preliminary injunctive relief, the scope of that relief would obviously be the same as the constitutional requirements established by the Supreme Court. For purposes of this section 1983 action, we could only require the defendants to turn over material, exculpatory evidence to the criminal defendant and to preserve all evidence that possesses an apparent exculpatory value. It is undisputed, however, that the CPD and the Cook County State's Attorney's Office, as public offices, must presently and at all times continue to adhere to these constitutional requirements. Accordingly, our preliminary injunctive relief would place no new limitations upon the defendants and the only effect of the injunction would be to unduly delay and disrupt the ongoing state criminal proceedings. In view of the strong Federal policy favoring deference to ongoing state criminal proceedings, where the subclass B plaintiffs can adequately raise their claims of constitutional violations, we hold that under the principles of *Younger,* the Federal court must abstain from granting the subclass B plaintiffs' motion for preliminary injunctive relief to restrain the defendants from continuing their alleged practice of withholding exculpatory evidence contained in "street files" and to preserve the existing "street files."

## B. PRELIMINARY INJUNCTIVE RE- LIEF

It is clear from our foregoing analysis that the district court erred in granting a preliminary injunction requiring the CPD and the Cook County State's Attorney's Office to restructure their internal procedures for the recording, maintaining, and production of investigative files. The subclass A plaintiffs lack standing to request this relief and the subclass B plaintiffs are involved in pending state criminal trials that, under the *Younger* abstention doctrine, preclude the district court from granting such relief. Accordingly, our review of preliminary injunctive relief is limited to whether the subclass A plaintiffs are entitled to preservation and production of the "street files" that exist for criminal defendants convicted of felonies in the Cook County Circuit Court. The law in this circuit is well-settled that in order to obtain preliminary injunctive relief, the plaintiffs must establish that:

1) They have no adequate remedy at law or will be irreparably harmed if the preliminary injunction does not issue;

2) The threatened injury to the plaintiffs outweighs the threatened harm the preliminary injunction may inflict upon the defendants;

3) The plaintiffs have a reasonable likelihood of success on the merits; and

4) The granting of a preliminary injunction will not disturb the public interest.

*Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, at 383 (7th Cir. 1984); *Godinez v. Lane,* 733 F.2d 1250, 1257 (7th Cir.1984); *Technical Pub. Co. v. Lebhar-Friedman, Inc.,* 729 F.2d 1136, 1138–39 (7th Cir.1984); *Alexander v. Chi-*

*cago Park Dist.,* 709 F.2d 463, 467 (7th Cir.1983); *Syntex Opthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 681 (7th Cir.1983); *O'Connor v. Bd. of Ed. of School Dist. No. 23,* 645 F.2d 578, 580 (7th Cir.), *cert. denied,* 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981); *Fox Valley Harvestore v. A.O. Smith Harvestore Prod.,* 545 F.2d 1096, 1097 (7th Cir.1976). The plaintiffs have the burden of proving each of these factors, *Godinez v. Lane,* 733 F.2d at 1257; *Shaffer v. Globe Protection, Inc.,* 721 F.2d 1121, 1123 (7th Cir.1983); *Dos Santos v. Columbus-Cuneo-Cabrini Med. Center,* 684 F.2d 1346, 1349 (7th Cir.1982); *Fox Valley Harvestore v. A.O. Smith Harvestore Prod.,* 545 F.2d at 1097, and in considering each factor the court "must weigh carefully the interest on both sides," *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1975).

██ According to the evidence presented at the preliminary injunction hearing, the subclass A plaintiffs have no adequate remedy at law to preserve the "street files" that presently exist for criminal defendants convicted of felonies in Cook County Circuit Court. In order to seek post-conviction relief in the Illinois state court system, the subclass A plaintiffs must demonstrate a "substantial denial" of a Federal constitutional right. *See* Ill.Rev. Stat. ch. 38, § 122–1 (1983). There is no conceivable manner in which the plaintiffs can meet this burden unless the existing "street files" remain intact and are available for review by members of the plaintiff subclass. The only practical means of assuring the preservation of these files is through equitable, injunctive relief. The failure to preserve such files may very well result in irreparable harm to a subclass A plaintiff. The testimony elicited at the preliminary injunction hearing reveals that the CPD officers often destroy the unofficial files following a defendant's conviction in the Cook County Circuit Court. Clearly, if the existing "street file" of a subclass A

plaintiff contains material, exculpatory evidence and the CPD does not continue to maintain that file, the affected subclass A plaintiff will be irreparably harmed. This threatened injury to the subclass A plaintiffs outweighs any threatened harm to the CPD and the Cook County State's Attorney's Office. In fact, the defendants admitted at the preliminary injunction hearing that all "street files" in existence at the time Judge McMillen entered the temporary restraining order on April 20, 1982, have been preserved.[12] The defendants will certainly incur no additional harm by continuing this practice of preserving the existing "street files" and allowing the subclass A plaintiffs access to those files, upon the proper drafting and filing of a specific subpoena. The record reveals that the subclass A plaintiffs have only had an opportunity to view eighteen unofficial "street files." In light of the fact that there are over 300 such files in existence, we are unable to determine, at this juncture of the lawsuit, if the subclass A plaintiffs have a reasonable likelihood of succeeding on the merits of their section 1983 claim. Moreover, without knowledge of the evidence contained within the existing "street files," we are in no position to speculate as to the likelihood of the subclass A plaintiffs' success in obtaining post-conviction relief in the Illinois state court. We are convinced, however, that the principles of equity and fairness dictate that a limited preliminary injunction be issued to preserve the "street files" now in existence for criminal defendants convicted of felonies in Cook County Circuit Court, and thereby allow the subclass A plaintiffs an opportunity to view the content of those files, upon the filing of a properly drafted, specific subpoena.

We emphasize that preliminary injunctive relief to preserve the existing "street files" is not intended to impose a general standard of investigative file preservation on the CPD or the Cook County State's Attor-

---

**12.** We note that Judge McMillen amended the temporary restraining order on September 27, 1982, because of allegations that the defendants were no longer placing investigative memos in

the "street files." The plaintiffs never contested that the defendants were destroying "street files" already in existence at the time of the original temporary restraining order.

ney's Office. The Supreme Court has clearly established that:

"Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, *see United States v. Agurs*, 427 U.S., at 109–10 [96 S.Ct. at 2400–01], evidence must both possess an exculpatory value that was apparent ... and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

*Trombetta*, 104 S.Ct. at 2534. It is the defendants' responsibility, as public officials, to draft policies and internal guidelines that incorporate this constitutional standard of preservation and assure criminal defendants the due process safeguard of a fair trial. The Federal courts have no business whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's Office, absent a clear and defined constitutional violation. *Cf. Bell v. Wolfish*, 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979) (Federal courts should defer to prison administrators). As the Supreme Court has noted, it is a "well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.' " *Rizzo*, 423 U.S. at 378–79, 96 S.Ct. at 607–08 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961)).

We add that by issuing this preliminary injunctive relief we do not intend to dictate to the CPD or the Cook County State's Attorney's Office the investigatory evidence that must be transmitted to criminal defendants. Under the principles of *Brady* and its progeny, the criminal defendant, upon a properly drafted request, has a constitutional right to material, exculpatory evidence. The Supreme Court noted in *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), that "[w]e know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." 408 U.S. at 795, 92 S.Ct. at 2568. *See also United States v. Agurs*, 427 U.S. at 109 and n. 16, 96 S.Ct. at 2400 and n. 16. The Court cautioned, however, that "[b]ecause we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. at 108, 96 S.Ct. at 2399. It is the combined responsibility of the State's Attorney of Cook County and the Superintendent of the CPD to formulate policies and internal directives that will guide their attorneys and police officers in determining the nature of information that must be transmitted to a criminal defendant in response to a properly drafted, specific subpoena or discovery motion. Our grant of preliminary injunctive relief does not infringe upon the inherently internal and discretionary function of the CPD and the Cook County State's Attorney's Office in responding to the variety of subpoenas and discovery motions received on a daily basis.

Principles of equity dictate that the "street files" in existence for criminal defendants convicted of felonies in Cook County Circuit Court, be preserved and made available for review by the subclass A plaintiffs, upon the drafting and filing of a specific subpoena. As a matter of convenience and judicial economy, we suggest that the "street files" included within the scope of this injunction be transmitted to the district court judge, assigned to this case, to be viewed *in camera*. *See, e.g., EEOC v. Univ. of Notre Dame Du Lac*, 715 F.2d 331, 338–39 (7th Cir.1983); *People ex rel. Fisher v. Carey*, 77 Ill.2d 259, 265, 32 Ill.Dec. 904, 906–907, 396 N.E.2d 17, 19–20 (1979). After a preliminary review of the files, the district court judge should inform the named subclass A plaintiffs of those class members with "street files." The named plaintiffs will then notify the

affected class members. Any subclass A plaintiff who files a properly drafted, specific subpoena, reviews his "street file," and discovers what he believes to be material, exculpatory evidence, may continue in the section 1983 lawsuit on the condition that he shows sufficient harm to establish standing. We caution, however, that the section 1983 lawsuit will be limited to a claim for damages, and any claim of improper imprisonment must be litigated in the Illinois state court.

## III

We reverse and remand this case to the district court with instructions to limit the preliminary injunctive relief to the preservation of "street files" now in existence for criminal defendants convicted of felonies in the Cook County Circuit Court.

Circuit Rule 18 shall apply on remand.

CUDAHY, Circuit Judge, dissenting in part and concurring in part.

I respectfully dissent from that part of the opinion which would deny to the plaintiffs in subclass B and to future members of subclass A an injunction preserving any and all unofficial files.[1]

These plaintiffs—both subclasses—have every right to seek relief in federal court. Where the district court went astray was in going beyond what is justified in a preliminary injunction. Beyond the incidental preservation of existing and future "street" files, nothing in the district court order addresses harm that is irremediable. Ignoring this simple point, the majority

launches into discussions of standing and comity that leave the quite unjustifiable impression that the presence of these plaintiffs in federal court is barely supportable. As I see it, there is not the slighest defect in the claim these plaintiffs make to have standing before the federal courts, and it is a misreading of the standing doctrine and of the doctrine of comity to find otherwise.

The issue raised by all of the plaintiffs is precisely analogous to that raised by plaintiffs who seek to prevent disbursement from a fund in which they arguably have a stake, hoping to preserve the fund until their claim has been adjudicated. Such temporary equitable relief would be paradigmatically appropriate. Although it may turn out that certain of the plaintiffs cannot establish that their claims are legitimate, and therefore cannot prevail on the merits, nevertheless if the fund is disbursed it will be too late even to consider the merits of their claims.[2] The preliminary relief sought by plaintiffs in this case is appropriate for exactly similar reasons. There is a fund of information—that contained in the informal or "street" files— against which plaintiffs, and all who are now or will in the future be similarly situated, have an arguable claim. At trial plaintiffs will seek a permanent injunction against maintaining separate files, and they will also seek damages. Whether they will prevail on the merits is something for the trial court to decide, but there is no question that in this regard the complaint is complete enough to establish standing. Since there is standing to seek a permanent

---

**1.** If the practice of maintaining separate files were struck down—as plaintiffs request and as the district court ordered—there would be no need to order the preservation of the files of *future* criminal defendants. I would be in favor of striking down that practice, but I concede that it may go beyond what is called for in a preliminary injunction. Whatever the correct course, the majority has *not* struck the practice down, and so, for the duration of the preliminary injunction at least, since there is no guarantee that no new informal files will be created, the preservation of such files should be ordered too. The Police Department's voluntary enactment of Special Order 83–1, although helpful, is of course irrelevant to the question of injunctive

relief. *United States v. W.T. Grant,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

**2.** A federal court that failed for reasons of comity to enjoin state action that threatened to disburse the fund while federal proceedings were ongoing would be remiss too. *See Donovan v. City of Dallas,* 377 U.S. 408, 412, 84 S.Ct. 1579, 1582, 12 L.Ed.2d 409 (1964); *Barancik v. Investors Funding Corp.,* 489 F.2d 933, 936 (7th Cir. 1973); *Heyman v. Kline,* 456 F.2d 123, 131 (2d Cir.1972); *Hyde Construction Co. v. Koehring Co.,* 388 F.2d 501, 502, 508 (10th Cir.1968) (all holding that judicial proceedings can be enjoined in these circumstances).

injunction and damages, plaintiffs have an arguable stake in the information in the informal files, and therefore, since destruction of the files irreparably impairs their case, they have no choice but to ask for a preliminary injunction preventing the destruction of the files.

The doctrine of standing limits access to the courts, but that is incidental to its purpose. The doctrine was not intended to reduce the case load of the federal courts, but rather to insure that the courts are called upon to resolve only conflicts that are fully developed and properly argued, and to insure that the parties do not undertake to accomplish in the courts what is more properly accomplished by the other branches of government. Constitutionally what is required is that neither injury to the plaintiff, nor causation by the defendant nor redressability by the action of the court be speculative or remote. The courts have further required that the grievance not be overly general, and that the right being asserted belong to the plaintiff and be within the zone of interests meant to be protected by the statute or provision under which the suit is being brought.

None of these requirements would bar the present case. The injury is concrete and not so generalized as to be more appropriate for resolution by the legislative branch. It is an injury that will have been caused by the defendants, and it is redressable only in advance, by a preliminary injunction. The grievance is specific to this class of plaintiffs, and the right being asserted is theirs. The doctrine of standing is a complex web, and all the parts of it must be satisfied; but attention to the details of the doctrine does not require us to give up our common sense. "[T]he constitutional standing requirement [cannot be made] a mechanical exercise." *Allen v. Wright,* — U.S. —, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984).

Plaintiffs have asked for relief "on their own behalf and on behalf of the subclass of persons who are similarly situated, and who have been or *who will be* deprived of their federal and state Constitutional rights." Appellants' Brief, Appendix at 45 (emphasis supplied). Since the majority does move to preserve the existing files of subclass A plaintiffs, the real point of the standing discussion is to justify the denial of future relief—that is, the denial of similar relief to the future members of the class.

When plaintiffs have a right to bring a suit, the class action suit makes it possible for them to bring the suit on behalf of others who are similarly situated, including (especially under Fed.R.Civ.P. 23b(2)) those who may in the future have similar claims. *See, e.g., Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 254 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Ingram v. O'Bannon,* 88 F.R.D. 653, 656 (E.D.Pa.1980); *see also Doe v. Charleston Area Medical Center,* 529 F.2d 638, 645 (4th Cir.1975) (speculative and conclusory representations as to class size suffice for declaratory and injunctive relief); *Dudo v. Schaffer,* 82 F.R.D. 695, 699 (E.D.Pa.1979) ("[C]ourts often define classes to include persons who have not yet been affected by the challenged policies, but who may be affected by them in the future.") In any given case, it may or may not be appropriate for a federal court to certify a class containing future members; but this is a question of certification, and not of standing. When the courts deny a class *standing* because of the remoteness or speculativeness of the injury—as the Supreme Court did in *Lyons*—the injury has been speculative or remote with respect to the in-court plaintiffs. *Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). I believe it is inappropriate to address what is essentially a class certification issue on standing grounds. If the named plaintiffs have a legitimate claim to have their files preserved, and if they legitimately represent the class of present and future criminal defendants in a similar position, then standing to seek the preservation of the files of the future members should not be an issue at all. Since I believe that the class A plaintiffs have every right to bring this suit seeking preservation of their own files, and since I see no

reason why they may not represent a class which includes not only present but also future members, I cannot agree with the discussion of standing and the conclusion that follows from it.

The majority, for reasons of comity, also offers no relief to those in-court plaintiffs whose convictions are still to come. There would appear to be three avenues of relief for the plaintiffs in this subclass: the avenue we have closed today, of resolving the matter as a whole in federal court; the avenue of resolving the matter as a whole in state court; and the avenue of resolving the matter individually during prisoners' state court trials. Since plaintiffs are not required to institute a section 1983 suit—or any similar suit based on state law—in state court before approaching the federal courts, *Patsy v. Florida Board of Regents,* 457 U.S. 496, 500, 102 S.Ct. 2557, 2559, 73 L.Ed.2d 172 (1982); *Steffel v. Thompson,* 415 U.S. 452, 472–73, 94 S.Ct. 1209, 1222–23, 39 L.Ed.2d 505 (1974); *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 481, 5 L.Ed.2d 492 (1961), I take it the majority does not suggest that this action as a whole be revived in state court, but rather intends the last to be the plaintiffs' remedy: a case-by-case adjudication of the matter in the plaintiffs' individual criminal proceedings.

In its search for a justification for its distinction between subclass A and subclass B, the majority turns to the *Younger* doctrine. It is beyond my powers of exegesis to find this case in *Younger.* Even if *Younger* is to be extended, as in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), to include nonjudicial state action, it applies only where "the federal plaintiff can secure a full and fair hearing" on his constitutional claims by raising them as a defense in a state enforcement proceeding. P. BATOR, P. MISHKIN, D. SHAPIRO, & H. WECHSLER, HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 283 (1981 Supp.) Where the rights of the plaintiffs could not be adequately protected in state proceedings, *Younger* has not been applied. In *District Properties Associates v. District of Columbia,* 743 F.2d 21 (D.C.Cir.1984), deference to the district courts was held to be inappropriate because case-by-case determination would be inadequate as a remedy. In such situations, "there is no general principle that forbids federal courts from 'interfering' in the processes of state and local courts when that interference is in reality the vindication of federal rights in cases within their jurisdiction." *Id.* at 27. The court cited *Silverman v. Barry,* 727 F.2d 1121 (D.C.Cir.1984), in which Judge Bork held that "sensitivity and the notion of localism alone do not provide a principled rationale for abstention where federal jurisdiction admittedly exists. Federal courts routinely decide local matters of great sensitivity and we are not convinced that abstention from a federal question case may be based on this rationale." *Id.* at 1124, n. 4.

What is at issue here is the destruction of files of evidence before subclass B plaintiffs come to trial. This injury cannot be prevented by having them litigate the injury in that very trial.[3] Even the federal writ of habeas corpus does not require the exhaustion of state remedies where the imposition of that requirement would irreparably harm the claim being made. In *Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973), a case in many ways similar to this one, the Supreme Court held that habeas was available on the question of a denial of

---

**3.** The majority feels that motions to preserve the evidence filed in state courts will protect the constitutional rights of those not yet convicted. I have made it clear that I am not at all sure that this is so. But even if it were, the majority overlooks the fact that there is no guarantee that in the future such evidence will not be destroyed before future criminal defendants are in a position to make such a motion. In any case, I reiterate that there will be no interference with criminal proceedings because of an order to preserve from the federal court, and that even if there were we are not obliged in circumstances such as these to defer to a state court determination of whether the files are to be preserved or not. There is simply too much at stake.

a speedy trial even though state remedies had not been exhausted. In that case, as here, to insist that the issue in question be litigated as a defense in the upcoming trial could be tantamount to denying the prisoner the protection he sought.

I am willing to leave to the state courts, in the first instance, the question whether the material preserved must be produced. Habeas may ultimately be the proper avenue of recourse to the federal courts for objecting to decisions of the state court on this matter. But I fail to see how ordering the preservation of the files can in any way interfere with ongoing state proceedings. Should a prisoner come into federal courts asking to have proceedings against him enjoined because his file was destroyed— an odd course of action, surely—that might be the appropriate time to consider the ramifications of the *Younger* doctrine. The injunction that the plaintiffs now seek is not directed at the state prosecutions. In *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), a class action for declaratory and injunctive relief requiring the state of Florida to make determinations of probable cause for detainees, the Supreme Court said:

> The District Court correctly held that respondent's claim for relief was not barred by the equitable restriction on federal jurisdiction in state prosecutions, *Younger v. Harris*, 401 U.S. 37, [91 S.Ct. 746, 27 L.Ed.2d 669] (1971). The injunction was not directed at the state prosecutions as such, but only at the length of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits.

*Id.* at 108, n. 9, 95 S.Ct. at 860, n. 9. In the case before us, even if the issue of the destruction of files could be raised as a defense (I am not clear how), the harm would already have been done.

The majority makes considerable reference to *Lyons*, and it is instructive to see just how *Lyons* differs from the case be-

fore us. In *Lyons*, an injunction was sought to prevent the Los Angeles police from ever using chokeholds in ordinary circumstances. The Supreme Court ruled that the plaintiff did not have standing to bring the suit, largely because it was speculative that he would ever again be in trouble with the law. The plaintiff was not suffering ongoing harm—he was not at the time of trial being choked—and he was not threatened imminently with being choked. Since the injury was past, there was a complete remedy at law: he could have sought damages. Had the city held him in a chokehold during the litigation of his claim, thereby putting him in fear for his life, an injunction would have been appropriate; once he was dead, damages would be an inadequate remedy. In the case before us, once the files are destroyed the damage is done.

These plaintiffs clearly have standing. Their files are in danger of being destroyed. Certainly they have the right to ask for a preliminary injunction; the question of a permanent injunction is not before us now. The question is so serious, and the threatened harm so great, that I find that the majority's deference to some future state proceeding in the name of comity to be a miscalculation of constitutional values. I cannot think of a single reason to defer to the state here. Deference is not necessary in a 1983 proceeding; the issue is a federal rather than a state issue; to defer will prolong rather than shorten the litigation; no state proceeding on the matter before us is now ongoing; and the delay involved may cause irreparable harm.

I would not affirm the holding of the district court which undertook to prescribe procedures for the Chicago Police Department but paid little attention to the details of the plaintiffs' request. I would remand for a preliminary injunction to preserve the "street" and other informal files, and I would not restrict it to the files of the present members of class A but would extend it to the files of all members of class A and class B.