**William DOULIN and Benjamin Perlman, individually and on behalf of a class, Plaintiffs,**

v.

**The CITY OF CHICAGO, et al., Defendants.**

No. 82 C 6771.

United States District Court, N.D. Illinois, E.D.

Aug. 25, 1986.
Judgment Order April 20, 1987.

Kenneth N. Flaxman, Elizabeth R. Dale, Kenneth N. Flaxman, P.C., Chicago, Ill., for plaintiffs.

Judson H. Miner, Corp. Counsel and Herbert L. Caplan, Diane J. Larsen Asst. Corp. Counsels, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

The Chicago Police Department has a policy of detaining all arrestees, whether on felony charges or on misdemeanor charges, as long as it takes for their fingerprints to clear before releasing them on bond or presenting them to a judge or magistrate for a probable cause hearing. This case is a class action challenging that policy. The class consists of all persons who were arrested since 1977 [1] on misdemeanor charges and who were detained pursuant to the fingerprint clearing policy of the Chicago Police Department despite their ability and right to post bond and be released. Members of the plaintiff class assert that the fingerprint clearing policy violates their Fourth Amendment right to be free from unreasonable seizures in violation of 42 U.S.C. § 1983 and, in addition to damages, seek declaratory and injunctive relief. The issue squarely posed by this case, therefore, is whether the Fourth Amendment, applicable to the states by virtue of the Fourteenth Amendment, prohibits the City of Chicago from detaining misdemeanor arrestees, who have not been presented to a judge for an independent

---

1. In *Anton v. Lehpamer*, 787 F.2d 1141 (7th Cir.1986), the Seventh Circuit held that, in Illinois, a plaintiff whose cause of action under 42 U.S.C. § 1983 accrued before the Supreme Court's decision in *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), must file suit within the shorter period of either five years from the date his action accrued or two years after *Wilson.* This case was filed as a class action on November 3, 1982, before *Wilson.* Accordingly, the statute of limitations period for class members began on November 3, 1977.

probable cause determination, for an indeterminate length of time until their fingerprints have been cleared so that their identities can be established with virtual certainty. This Court holds that it does.

The original complaint in this case was filed on November 3, 1982. The named plaintiffs, William Doulin and Benjamin Perlman, initiated this action on their own behalf and on behalf of all others similarly situated.[2] Since then, the complaint has been amended twice to add two more named plaintiffs and to seek declaratory relief as well as injunctive relief and damages. Counts II, III, and IV of the Second Amended Complaint and all class allegations stemming therefrom are at issue here.[3] On July 9, 1984, Judge Moran certified a class, pursuant to Fed.R.Civ.P. 23(b)(2), consisting of:

> All persons who were arrested on other than a felony charge by a police officer of the City of Chicago on or after November 3, 1977, and who were detained pursuant to the "fingerprint clearing" policy of the City of Chicago implemented in Police Department General Order 78–1.

■ This Court held a bench trial solely on the issue of the defendants' liability for declaratory and injunctive relief for the class from May 23 to June 3, 1986.[4] The

---

2. In Count I of the Second Amended Complaint, named plaintiffs Doulin and Perlman seek damages for their alleged bad faith arrests without probable cause by the Chicago Police Department for the offense of receipt of stolen property. These allegations are not presently at issue.

3. On March 29, 1983, Judge Moran, to whom this case had then been assigned, denied the defendants' motion to dismiss the complaint, holding that the complaint satisfied the requirements set forth in *Monell v. Department of Social Services of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), for asserting municipal liability under 42 U.S.C. § 1983: i.e., the existence of a policy, practice, or custom which caused the alleged Fourth Amendment violation. Specifically, Judge Moran found that the Chicago Police Department's General Order 78–1, which requires fingerprinting and fingerprint clearance of arrestees, constitutes a policy of the City of Chicago that could result in unconstitutionally lengthy post-arrest detentions. Judge Moran also stated in his opinion:

> The mere fact that the Chicago Police Department has a general stated policy of expeditious processing of arrestees does not relieve it of liability if a specific required procedure results in a constitutional violation. The City's good intentions are irrelevant under such circumstances, *cf. Owen v. City of Independence*, 445 U.S. 662 [622] [100 S.Ct. 1398, 63 L.Ed.2d 673] (1980), and a general policy against constitutional violations does not require the conclusion that any violations which may occur in the face of such a policy are attributable solely to the individual municipal employees involved.

(Memorandum and Order, March 29, 1983, at 3.)

4. On the eve of trial, defendants filed a motion to decertify the class. In essence, that motion is a motion to reconsider Judge Moran's July 9, 1984 decision ruling that class certification was proper. This Court proceeded with the trial and informed the parties that, after full briefing, it would consider the motion with the merits of the case after trial. At this time, the Court denies the motion to decertify the class for the reasons stated in Judge Moran's well-reasoned opinion of July 9, 1984. The only significant new authority cited by defendants in their motion to decertify is *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir.1985). Nothing in that opinion, however, justifies reconsideration of Judge Moran's holding that class certification is proper even though the named plaintiffs here did not have a live claim for injunctive relief at the time they filed their complaint. In *Palmer*, class certification was not contested, and thus the Seventh Circuit did not address whether the class could obtain a "declaratory judgment, permanent injunctive relief, and damages." 755 F.2d at 573. This Court thus agrees with Judge Marshall, Judge Moran, and Judge Leighton of this District that even plaintiffs who do not have a live claim for injunctive relief at the time the class action complaint is filed may nonetheless act as class representatives under the "capable of repetition yet evading review" doctrine and the "relation back" doctrine set forth by the Supreme Court in cases such as *United States Parole Commission v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980); *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); and *Sosna v. Iowa*, 419 U.S. 393, 402 n. 11, 95 S.Ct. 553, 559 n. 11, 42 L.Ed.2d 532 (1975). *See Doulin v. City of Chicago*, No. 82 C 6771, mem. op. (N.D.Ill. July 3, 1984) (Moran, J.) [Available on WESTLAW, DCT database]; *Robinson v. City of Chicago*, No. 83 C 5685, mem. op. (N.D.Ill. Feb. 21, 1986) (Leighton, J.) [Available on WESTLAW, DCT database]; *Lewis v. Tully*, 99 F.R.D. 632 (N.D.Ill.1983) (Marshall, J.). *But see, Williams v. City of Chicago*, 609 F.Supp. 1017 (N.D.Ill.1985) (Aspen, J.).

Shortly after the trial in this case, Judge Leighton issued an opinion in a case virtually identical to this case on the decertification is-

Court deferred a trial on the issue of damages, for which the defendants have demanded a jury trial, to a later date. At the conclusion of the trial, the Court requested that the parties file proposed findings of fact and conclusions of law and supporting legal briefs. Pursuant to Fed.R.Civ.P. 52(a), the Court hereby enters its Findings of Fact and Conclusions of Law setting forth the reasons for its conclusion that plaintiffs have established liability on the merits.

## FINDINGS OF FACT

1. Named plaintiff Benjamin Perlman is the proprietor of a retail jewelry store known as "Imperial Jewelers" in Chicago. He has been a retail jeweler for over twenty-five years. Named plaintiff William Doulin is employed by Perlman as the manager of the jewelry store. As part of the ordinary course of business, Perlman buys scrap gold from the public. On October 9, 1981, Perlman and Doulin were arrested by Chicago police officers for the misdemeanor offense of receipt of stolen jewelry. At the time of the arrest, Perlman had operated that particular jewelry store for over 10 years and was well known to neighborhood police officers. Indeed, several of them recognized him at the station house, where, after the arresting officers completed the paperwork incident to the arrest, Doulin and Perlman were taken to the "lockup." At the lockup, they were each fingerprinted and placed in a joint cell to await fingerprint clearing despite the fact that both had available the $100 cash bond set by Illinois Supreme Court Rules 528 [5] and 530 [6] for misdemeanor offenses. Neither Doulin nor Perlman were permitted to post bond until their fingerprints "cleared" pursuant to Chicago Police Department General Order 78–1. Perlman was confined for six hours and Doulin was confined for twelve hours as a result of Chicago's post-arrest detention policy even though the police knew who they were.

2. Gayle Borg is an unnamed plaintiff member of the above-described plaintiff class. On May 6, 1983, Borg was arrested at her home at about 10:30 p.m. and charged with having permitted minor children, who were attending her daughter's birthday party, to consume alcoholic beverages. Borg was in custody for three hours before she was fingerprinted at the women's lockup. Pursuant to Chicago Police Department policy, before women are fingerprinted, they must be transported to one of four women's detention centers in

sue. The City of Chicago moved to reconsider Judge Leighton's ruling in *Robinson, supra,* that the class be certified, arguing that the named plaintiff could not seek declaratory relief on behalf of the class because his claim was moot. Judge Leighton denied that motion in a well-reasoned opinion. *Robinson v. City of Chicago,* 638 F.Supp. 186 (N.D.Ill.1986).

5. Illinois Supreme Court Rule 528 provides as follows:

(a) *Offenses Punishable by Fine Not to Exceed $500.*
Bail for offenses (other than traffic or conservation offenses), including ordinance violations, punishable only by a fine which does not exceed $500 shall be $50 cash.
(b) *Offenses Punishable by Fine in Excess of $500.*
Bail for offenses (other than traffic or conservation offenses) punishable only by a fine which exceeds $500 shall be $1,000.
(c) *Certain Other Offenses.*
Bail for any other offenses, including violation of any ordinance of any unit of local government (other than traffic or conservation offenses) punishable by fine or imprisonment in a penal institution other than the penitentiary, or both, shall be $1,000, except that bail for Class C misdemeanors shall be $50 cash.

6. Illinois Supreme Court Rule 530 provides as follows:
The 10% cash deposit provision of section 110–7 of the Code of Criminal Procedure of 1963, as amended (Ill.Rev.Stat.1983, ch. 38, par. 110–7), applies in every case in which the amount of bail under these rules is $500 or more, except those cases involving truck violations under Rule 526(b)(1) or similar municipal ordinances.
Illinois Revised Statute ch. 38, § 206–5, is also relevant and provides in pertinent part:
All policing bodies of this State shall furnish to the Department, daily, in the form and detail the Department requires, copies of finger prints and descriptions, of all persons who are arrested on charges of violating any penal statute of this State ... Provided, however, that the information required to be furnished to the Department pursuant to this Section shall be required only for offenses which are classified as felonies and Class A or B misdemeanors.

Chicago.[7] Borg was fingerprinted at the women's lockup at about 1:30 a.m., and her fingerprints were then transmitted to the Identification Section of the Chicago Police Department. Borg's fingerprints were received at the Identification Section at 2:12 a.m. At 4:30 a.m., a fingerprint technician concluded that a new set of fingerprints was required. Borg was reprinted and her prints again were transmitted to the Identification Section, where they were reassigned to a fingerprint technician at 7:59 a.m. The fingerprint technician was unable to find Borg's prints on file, and her prints were set aside to be rechecked by a more experienced technician. The more experienced technician commenced the recheck at 10:15 a.m. At 10:25 a.m., the technician concluded that Borg's prints were not on file with the Chicago Police Department. Borg was permitted to post bond and was released at 11:00 a.m., over 12 hours after her arrest.

3. On May 9, 1983, named plaintiff Patricia Muhammad received a "warrant notice" which told her to report to the police station and post a $100 bond. Following receipt of the warrant notice, Muhammad telephoned the police station and learned that the warrant was on the misdemeanor offense of "deceptive practices" and that bond had been set on the warrant at $100. Muhammad gathered together $100 and, on May 13, 1983, went to the police station with the cash to surrender on the warrant. Muhammad arrived at the police station at about 12:00 noon and sought to post bond. As required by General Order 78–1 of the Chicago Police Department, the officers at the police station refused to permit Muhammad to post bond and instead caused her to be transported to a women's detention center at 1121 South State Street. Muhammad was fingerprinted at 3:20 p.m. and placed in a jail cell. Muhammad's fingerprints cleared at about 9:10 p.m., and she was released on bond at 9:30 p.m.,

approximately 9½ hours after she arrived at the station to post bond.

4. Howard Sery is also an unnamed plaintiff. Sery was arrested at his home about midnight on May 9, 1984 by Chicago police officers and charged with misdemeanor offenses. Sery was fingerprinted about 1:00 a.m., and his fingerprints were received at the Identification Section at 3:52 a.m. Sery was permitted to post bond at approximately 11:00 a.m. on May 9, 1984 when the results of the fingerprint check were "waived" by the watch commander, as provided for by General Order 78–1. Sery's prints were ultimately assigned to a fingerprint technician at 1:30 p.m. on May 9, 1984.

5. One objective of the Chicago Police Department's fingerprint clearing policy as embodied in General Order 78–1, which was applied to all of the named plaintiffs and continues to be applied to all persons arrested in Chicago on all misdemeanor as well as felony charges, is to determine if a person's fingerprints are on file with the Chicago Police Department, so as to determine with virtual certainty the true identity of an arrestee. The Chicago Police Department, however, maintains in its files only the fingerprints of those persons it has previously arrested.

6. Once an individual is arrested, he is transported to a district police station for "booking." The arrestee is interrogated, photographed, and fingerprinted. The fingerprint clearing process begins with the actual fingerprinting of the arrestee, a process which ordinarily does not require more than five minutes, although it may take longer if the arrestee offers resistance. However, the actual fingerprinting is not done until after the arrest report is completed and after the arrestee is transported to the lockup. Because all women are transported to a women's detention center

---

7. This policy of transporting women to one of four women's detention centers is the result of an Agreed Order entered by Judge Grady reflecting the settlement agreement between the parties in *Keenon v. Conlisk*, No. 73 C 3247, on April 14, 1976. Although one of the witnesses for the City of Chicago testified that he believed the policy was a result of a federal court order (Burzinski Tr., May 23, 1986, at 65–66), neither the City nor the plaintiffs presented any further evidence on this point, and this Court discovered the existence of the April 14, 1976 order through its own research.

after the arrest report is completed and before fingerprinting, women are subject to even greater delays. The Chicago Police Department prepared an internal audit entitled "Identification Procedures in Misdemeanor Arrests" in January 1983. (Plaintiff's Ex. 11.) Attachment 1 to the audit demonstrates that generally more than one hour elapses from the time of arrest to the time of fingerprinting. When a top level officer of the Chicago Police Department was asked if there was any law enforcement reason that fingerprinting could not be accomplished before the arrest report was completed, the answer was that "good procedure would dictate that proper procedures are followed. Whatever analysis was done to put these procedures in effect would dictate how the procedure is put forward." (Burzinski Tr., May 23, 1986, at 64.)

7. After the arrestee has been fingerprinted, the prints are transported to the Identification Section of the Chicago Police Department either by a pneumatic tube,[8] by facsimile ("fax") machines, or by police mail. Police mail adds several hours to the fingerprint clearing process (Plaintiffs' Ex. 18), and the Chicago Police Department's audit revealed that more than 45% of fingerprint records sent by fax machines during the audit period were unreadable. (Plaintiffs' Ex. 11, at 5.)

8. After prints are received at the Identification Section, they are logged in on a "Fingerprint Receiving Sheet." (Plaintiffs' Ex. 2.) The fingerprints are then examined by a "Tech III" grade fingerprint technician, who "primes" them to determine the basic "Henry" classification of each finger, the standard classification system used in fingerprint identification. He then uses the "identification records" computer system to determine if there appears to be an "IR number" for the arrestee. The IR number is the number assigned to each individual who has been arrested and booked in the City of Chicago and is the means by which that individual is identified and his criminal history is tracked from that point on. The arrestee's fingerprint record is the basis for creating a master criminal history file ("rap sheet") located by the unique IR number assigned to each individual arrestee. The actual time required for the computer search is a few seconds to three or four minutes. Approximately 60% of the time, the computer will show that the arrestee's prints are on file under a particular IR number.

9. After the technician has completed the computer search, he could walk to a file drawer to determine if the computer is correct. Such a comparison would require approximately ten minutes. This procedure, however, is not followed in the Identification Section. After completing the computer search, the Tech III notes the possible IR number on a "job control ticket" and places the ticket and the fingerprint record into a work basket, where it will sit for some time before a "Tech I" grade fingerprint technician will take it and walk to the file drawer to check the prints against those on file.[9]

10. If the Tech I verifies that the fingerprints match, the new arrest will be added to the criminal history record or rap sheet, which is kept by IR number for each arrestee. The time of completion by the technician is logged on the "Fingerprint Receiving Sheet," and a copy of the rap sheet is transmitted to the police station where the arrestee was fingerprinted. Upon receipt of the rap sheet, the arrestee's fingerprints will be considered to have cleared.

11. If the Tech I is unable to match the arrestee's prints with those on file, however, the fingerprint record is placed into a

---

8. Although it would seem that the pneumatic tube linking the women's detention center to the Identification Section at 1121 S. State Street should be the fastest method of transporting prints, that conclusion is not necessarily valid. For example, 45 minutes elapsed for plaintiff Muhammad's prints to move through the tube at 11th Street.

9. The pre-assignment delay can be much longer than several hours. Class member Howard Sery was fingerprinted at 1:00 a.m. on May 9, 1984. His fingerprints were received at the Identification Section at 3:52 a.m. that day, but not assigned to a fingerprint technician until 1:30 p.m.

"recheck basket," with the time logged on the Fingerprint Receiving Sheet. These fingerprints are reviewed by a "Tech II" grade fingerprint technician, who will attempt to give the prints an "extended classification" under the Henry system if the prints are clear enough and conduct a visual comparison with all prints on file with a similar classification. The length of time usually necessary to classify a clear set of prints is approximately 5 minutes. If the prints are not clear enough to be classified, however, additional delay is incurred while the arrestee is reprinted or the original fingerprint cards are transported to the Identification Section.[10]

12. Once the Tech II has completed the secondary classification, he will look through a file drawer to determine if the prints match any of those that are on file. If the Tech II is unable to match the arrestee's prints with those on file, a new IR number will be assigned to the arrestee who, at that time, is deemed to have cleared fingerprinting. As a result of this method, fingerprints of those persons who have never been arrested before take significantly longer to clear than prints of repeat arrestees.

13. All of the Chicago Police Department's law enforcement witnesses testified at trial that fingerprinting is the only available reliable means of positively identifying arrestees and establishing their true identities and prior criminal histories. Other forms of identification can be false because identification such as drivers' licenses or other documents can be altered, stolen, or otherwise easily obtained. They justify Chicago's fingerprint policy by asserting that the prior criminal history of an arrestee obtained through the fingerprint clearing policy allows law enforcement authorities to determine the proper level of charges and to set the proper level of bail because some misdemeanor offenses—e.g., prostitution, retail theft, unlawful use of weapons, and possession of drug parapher-

nalia—may be upgraded to felonies if there is a history of prior convictions. Moreover, once an arrestee's true identity is established, the existence of outstanding fugitive warrants or stop orders for interrogation of that arrestee can be determined and executed. Finally, arrestees who are on probation, parole, prior bond, or supervision can be identified and proper authorities notified for follow-up action.

14. Approximately 70% of arrestees are repeat offenders; i.e., they have been arrested before. Repeat offenders are more likely to conceal their identities to avoid identification, and they are also likely to have been released on a prior offense on some condition of supervision, probation, parole, or bond.

15. On the average, the Chicago Police Department arrests between 360 to 370 persons each week day and approximately 400 persons each weekend day. Prints are assigned to a technician for identification on the average within 1 hour and 15 minutes of arrest. The fingerprint identification equipment used by the Chicago Police Department was state-of-the-art when originally purchased in the 1970's and is used in several large police departments. Most major law enforcement agencies have the same policy as Chicago's of fingerprinting and clearing arrestees before release on bail. Although the actual process of comparing an arrestee's prints with those on file requires approximately 10 minutes, the average time to clear prints in the Identification Section is between 4 to 6 hours. Other processing activities require additional time. A study of seven weekend periods in 1982, when arrests are generally highest, reflects average fingerprint processing times between 3 hours and 22 minutes and 5 hours and 21 minutes. A similar study from data collected in the Chicago Police Department audit evidences that 57.08% of the misdemeanor arrestees under study were detained between 5 to 10 hours before charging, 30.2% were detained between 10

---

**10.** The delay caused by postponing the decision that fingerprints are not useable is illustrated by the evidence concerning the arrest of class member Gayle Borg. Ms. Borg was arrested at her home at about 10:30 p.m. and fingerprinted at about 1:30 a.m. Borg's fingerprints were received at the Identification Section at 2:12 a.m., but more than two hours elapsed before a fingerprint technician concluded that Borg should be reprinted.

and 15 hours, 5.05% were detained between 15 and 20 hours, and 2.45% were detained 20 hours or more before charging. Moreover, print results were waived by watch commanders for 1.1%, and 9.1% of arrestees were printed when not required.[11] In 25% of all cases the fingerprint clearing process lasts more than 5 hours, and more than 10 hours in 10% of all cases. (Plaintiffs' Ex. 11 at 1–2.)

16. Chicago has been studying the use of newly developed automated fingerprint identification equipment for many years. It has entered into a $4.2 million contract for the purchase of computer hardware, with related construction costs of $300,000, and the City has commenced the conversion of fingerprint records into a computer data base. The system is expected to be in place in Chicago by September, 1986. After the basic equipment is installed, remote access terminals will be installed to permit print comparisons directly from district stations. Two terminals, at a cost of $35,000 each, have been ordered, and nine more are budgeted for fiscal year 1987. Nonetheless, this new system will not be fully operative for quite some time, and, in any event, the evidence demonstrates that unless basic changes are made in the procedure for fingerprint clearing as set forth in General Order 78–1, the new system will not significantly reduce the total time for fingerprints to clear.

17. Chicago presently has available to it two separate computerized systems that display "wanted" information on both a state and national basis to aid in identification of arrestees. The first system has been discussed above and is known as the "identification records" computer system which permits inquiry of a computerized data base by name to determine if a person's fingerprints are on file. This system will also display all known aliases for a particular person. Second, Chicago has what is known as the "hot desk" system. This system can be accessed from computer terminals that have been installed in police cars so that the arresting police officer can have on-the-spot access to identification information. By entering last name, first name,[12] and sex, a police officer can determine if a particular individual is sought on an outstanding arrest warrant or is the subject of a "stop order" provided that the arrestee provides his truthful name or an alias upon which he has previously been arrested. This system also provides access to the State of Illinois criminal justice information network (the "Illinois Law Enforcement Agency Data System," or "LEADS"), as well as to a national database of wanted persons (the "National Crime Information Center," or "NCIC").[13] Chicago police officers deem the computer name check provided by these two systems as adequate to determine whether an arrestee is sought on an outstanding warrant, assuming that the arrestee has provided truthful information concerning his identity or an alias upon which he has previously been arrested. An arrestee's IR number can be obtained within minutes approximately 50% of the time by use of these automated computerized systems. Once

11. General Order 78–1 permits watch commanders at the district police stations to waive fingerprint clearing for some arrestees under certain circumstances so that they may be released upon posting bond without awaiting full fingerprint clearance. ·Moreover, General Order 78–1 does not require that all arrestees charged with certain traffic offenses and municipal ordinance violations be fingerprinted. General Order 78–1 does require, however, that persons arrested on all misdemeanor charges must clear fingerprinting before they are released on bond. In this respect, General Order 78–1 goes beyond state law, which only requires that persons arrested on Class A and Class B misdemeanors be fingerprinted. *See* notes 5 and 6, *supra*.

12. The "primary screen" for the "hot desk" computer is surname (and known alias surnames), which are stored in the computer in a "soundex code." The "soundex code" brings together all variants of the same name. (Plaintiffs' Ex. 27.) For example, starting with the surname of "Brown," the computer will retrieve records of persons with the surname "Browne," "Bruhn," "Bruin," "Brumm," "Bruno," "Bryan," "Burian," "Braun," "Brehn," and "Brame." In addition, the officer can narrow the search by supplying additional information such as height, weight, and age.

13. In addition, the hot desk system permits police officers to make inquiries of the Illinois Secretary of State and 36 other states to determine driver's license information.

the IR number is obtained, a Chicago Police Department witness testified that no reason exists why the fingerprint technician could not go directly to the file to verify that the fingerprints actually match except that the procedure set forth in General Order 78–1 "is the way it's done." (Burzinski Tr., May 23, 1986, at 77, 116.)

18. The City of Chicago contends that the vast majority of outstanding arrest warrants are executed when the wanted individual has been arrested again and is in custody on some other charge. The City's expert, Assistant State's Attorney James G. Piper, testified that 3 out of 4 arrestees of the Chicago Police Department are arrested on misdemeanor charges and that misdemeanor arrestees account for the majority of warrant clearances on felonies. The City, however, did not introduce any evidence whatsoever to demonstrate the number of misdemeanor arrestees who give a new alias upon arrest and who are held on warrants or stop orders as a result of positive identification established through the fingerprint clearing policy. Other than opinion testimony, the City produced no concrete evidence to justify a policy applied to all persons arrested on misdemeanor charges and which clearly intrudes upon the Fourth Amendment rights of citizens. The Chicago Police Department's internal audit of its fingerprint clearing policy revealed that the only outstanding warrants which had been found during the fingerprint check were of persons who had been arrested not on misdemeanors, but on traffic warrants or on municipal ordinance violation charges, charges for which fingerprinting is not required by the City's policy.

19. Chicago's fingerprint clearing policy is of no benefit to law enforcement authorities for those persons who have never been arrested before in Chicago, approximately 40% of all arrestees, because those persons' prints are not on file in Chicago.[14] Further, the fingerprint clearing policy provides no immediate benefit to law enforce-

ment authorities for those arrestees who previously have been arrested in Chicago and have given a correct name, approximately 50% of all arrestees. Finally, although the fingerprint clearing policy may divulge desirable information about the remaining 10% of all arrestees, still a sizeable number considering that approximately 100,000 persons are arrested on misdemeanors in Chicago each year, the City presented no concrete evidence that any of these persons are found to be sought on outstanding warrants or stop orders. Thus, one of the principal purposes behind the fingerprint clearing policy—i.e., to identify persons sought in outstanding arrest warrants or stop orders who give false names upon arrest—is unsupported by any statistical evidence.

20. Although the Court specifically indicated an interest in hard statistical evidence of misdemeanor convictions, the best the City could do was to present the testimony of its expert which itself was based on hearsay evidence. Even this evidence, however, demonstrates the low rate of misdemeanor convictions. Of 7000 cases disposed of during a one month period, 1249 defendants received sentences of "supervision" pursuant to Ill.Rev.Stat. ch. 38, § 1005–6–1(c), 260 received probation, and 118 received a "conditional discharge," or nonreporting probation. An additional 467 defendants were fined, and 537 were sentenced to jail. The overwhelming majority of jail sentences in misdemeanor cases are of "time considered served," where "generally speaking people are held overnight that can't make bail, they go to court in the morning, they will get credit for two days time considered served from the time they were in custody." (Cooley Tr., June 2, 1986, at 95.) The number of defendants who receive additional incarceration is "almost nonexistent." (Cooley Tr. at 94.) Thus, the fingerprint clearing policy is not justified by the conviction rate of misdemeanor arrestees.

---

**14.** A Chicago Police Department witness testified that of the approximately 100,000 misdemeanor arrestees in Chicago each year, "60% of the time we are able to find the IR number in our computer. Approximately 70% of the people ... have been arrested before." (Burzinski Tr., May 23, 1986, at 30).

21. To the contrary, this evidence demonstrates that the City of Chicago has turned lengthy post-arrest detentions of misdemeanor arrestees, ostensibly for the purpose of clearing their fingerprints, into the penalty or punishment itself for misdemeanor crimes upon which these arrestees have not been convicted and on which they have a right to be presumed innocent. Indeed, those who are most probably innocent are likely to suffer the greatest incursion of their Fourth Amendment rights because they are detained longer on the average than those persons who have been arrested before in Chicago.

22. Finally, although the City contends that the use of fingerprint identification to establish the true identity of an arrestee may assist in establishing innocence, as well as guilt, evidence presented by plaintiffs in their case in rebuttal demonstrated that the City's fingerprint clearing policy does not necessarily assist those who are wrongfully arrested. For example, Thomas Smith was arrested because his name came up in a computer search, but because he had never before been fingerprinted in Chicago, his twelve hours of detention while his fingerprints were checked shed no light on whether or not Smith was the person actually sought in the warrant. Similarly, Richard Brown was arrested because a Chicago police officer thought that Brown was a person named "Max Rogers." By checking Brown's fingerprints, the Chicago Police Department determined that Brown was in fact Richard Brown, but Brown was held in custody until a police officer came to court and confirmed that Brown was not Rogers. And a man named Orlando Rivera was arrested by Chicago police officers in 1982 and held on a warrant for a burglary charge. Fingerprint comparisons revealed that the Rivera in custody was not the Rivera sought in the warrant, but Rivera was nonetheless held in custody for 12 days before the error was discovered. The City presented no statistical evidence to support its argument that the fingerprint clearing policy aids innocent people. The City also did not present any admissable concrete examples, through its expert or otherwise, that the fingerprint clearing policy aids innocent people.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. § 1343, and the named plaintiffs are adequate class representatives of this class action, properly certified pursuant to Fed. R.Civ.P. 23(b)(2). The case presents a live and justiciable controversy about the constitutionality of Chicago's fingerprint clearing policy.

2. The plaintiff class in this action contends that the length of time required for the entire fingerprint clearing process for misdemeanor arrestees exceeds the "brief period of detention to take the administrative steps incident to arrest" permitted by the Fourth Amendment. *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975). Although this brief period of detention is legally sufficient to satisfy Fourth Amendment principles when a police officer has made an arrest based on his on-the-scene assessment of probable cause, "the Fourth Amendment requires a *judicial* determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* at 114, 95 S.Ct. at 863, emphasis added.

3. Post-arrest detention for misdemeanor arrestees in Chicago to permit identification via Chicago's fingerprint clearing policy as embodied in General Order 78–1 is not an "administrative step incident to arrest" permitted by the Fourth Amendment without a prompt independent probable cause determination by a magistrate or judge. In cases where the police have no reason to suspect that a misdemeanor arrestee's prior criminal history might cause a misdemeanor charge to be elevated to a felony, the administrative steps incident to arrest end when the arrest report and charging documents have been completed and fingerprints have been taken in cases where fingerprinting is required by state law. At that time, the state of Illinois has substituted the misdemeanor arrestee's right to a judicial determination of probable

cause with the right to be released on bond by posting a $100 cash bond.

■ 4. Detaining a misdemeanor arrestee who is able to post cash bond after the arrest report and charging documents have been completed until his fingerprints clear constitutes a separate and distinct incursion upon Fourth Amendment interests requiring at least "a quantum of individualized suspicion" independent of probable cause to arrest. *Delaware v. Prouse,* 440 U.S. 648, 654–55, 99 S.Ct. 1391, 1396–97, 59 L.Ed.2d 660 (1979); *see Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272–73 (7th Cir.1983). As applied to the plaintiff class, which must be redefined to exclude misdemeanor arrestees who have a reasonable probability of having the charges against them elevated to felony charges, the Chicago fingerprint clearing policy is not supported by reasonable suspicion. Neither is the post-arrest detention caused by that policy "brief," as required for a *Terry* detention. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

5. This Court has redefined the class of plaintiffs as follows:

All persons who were arrested on other than a felony charge by a police officer of the City of Chicago on or after November 3, 1977, who had no reasonable probability of having charges against them elevated to a felony charge, and who were detained pursuant to the "fingerprint clearing" policy of the City of Chicago implemented in Police Department General Order 78–1.

6. This Court concludes that for the above-defined class of plaintiffs, Chicago's fingerprint clearing policy, as presently evidenced in General Order 78–1, violates the minimum standards required by the Fourth Amendment. Accordingly, this Court will enter a declaratory judgment on behalf of the class defined above as to the illegality of Chicago's fingerprint clearing policy. The Court also grants permanent prospective injunctive relief to prohibit the City of Chicago from continuing the policy and to prohibit the detention of class members during the fingerprint clearing process solely because their fingerprints have not yet cleared.

## DISCUSSION

"Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart" as deprivation of the Fourth Amendment right to be free from unreasonable searches and seizures. *Brinegar v. United States,* 338 U.S. 160, 180, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting). Because "[u]ncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government," *id.,* the Framers of the Constitution specifically provided that citizens shall be arrested and detained only on probable cause. Detentions stemming solely from "common rumor or report, suspicion or even strong reason to suspect," *Henry v. United States,* 361 U.S. 98, 100, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959), are barred by the probable cause standard, a standard that is deep-rooted in the history of this nation and that is based on "a practical, nontechnical conception affording the best compromise that has been found for accommodating" the "often opposing" interests of individual freedom and effective law enforcement. *Brinegar,* 338 U.S. at 176, 69 S.Ct. at 1311.

■ In an attempt to justify its fingerprint clearing policy as applied to misdemeanor arrestees, the City of Chicago transposes the probable cause determination made on-the-scene by the arresting police officer to the constitutionally mandated probable cause assessment made by an independent judicial officer to which every arrested citizen is entitled. The two probable cause standards are different and can not be confused. The standard for a valid arrest and detention as determined by the police officer's on-the-scene assessment of probable cause is defined in terms of the "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein,* 420 U.S. at 111, 95 S.Ct. at 862, quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d

142 (1964). The Seventh Circuit has described this standard as "more than base suspicion but less than virtual certainty." *United States v. Garza-Hernandez*, 623 F.2d 496, 499 (7th Cir.1980). However, to assure that the privacy and liberty interests of law-abiding citizens are not delegated to the "mercy of the [police] officers' whim or caprice," *Brinegar*, 338 U.S. at 176, 69 S.Ct. at 1311, the Supreme Court has required that the existence of probable cause be decided by an independent, neutral, and detached judicial officer whenever possible. As the Supreme Court succinctly stated in *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

Thus, in *Gerstein, supra*, the Supreme Court left no doubt that the judicial officer's independent assessment of probable cause can be delayed only for the "brief" time necessary for the police to process an arrest:

> Under this practical compromise, a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest. Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate. There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interfer-

ence occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships. See R. Goldfarb, Ransom 32–91 (1965); L. Katz, Justice Is the Crime 51–62 (1972). Even pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty. *See, e.g.*, 18 U.S.C. §§ 3146(a)(2), (5). When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty. Accordingly, we hold that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.

*Gerstein v. Pugh*, 420 U.S. at 113–14, 95 S.Ct. at 862–63.

■ For misdemeanor arrestees, the state of Illinois has made the judgment that this independent probable cause assessment of a magistrate or judge shall be substituted by the right to be released upon the posting of $100 cash bond. Illinois Supreme Court Rules 528, 530; Ill. Rev.Stat. ch. 38, § 206–5. After the police have completed the "administrative steps incident to arrest," *Gerstein*, 420 U.S. at 114, 95 S.Ct. at 863, under Illinois law, a misdemeanor arrestee is entitled to release upon posting bail, and "there is a *mandatory* duty on a police department to accept tendered bail (set either by a judge or a supreme court rule) from misdemeanor defendants." *Lampe v. Ascher*, 59 Ill.App.3d 755, 17 Ill.Dec. 181, 184–185, 376 N.E.2d 74, 77–78 (4th Dist.1978). The question posed by this case is whether the "administrative steps incident to arrest" taken by the police before a misdemeanor arrestee is entitled to either a probable cause hearing before a judge or magistrate or before he can post cash bail and be released include waiting for the arrestee's fingerprints to clear pursuant to the City of Chicago's fingerprint clearing policy. This Court holds that the practical effect of the fingerprint clearing policy unjustifiably exceeds the "brief period" necessary to accomplish

the "administrative steps incident to arrest" permissible under the Fourth Amendment.

The City of Chicago justifies detention of misdemeanor arrestees until fingerprints clear in the following manner:

> Detention of misdemeanor arrestees during fingerprint processing is not a deprivation of liberty without due process. Such detention is for four specific and reasonable purposes. Fingerprint clearance is necessary for (1) positive identification of the arrestee; (2) determining the proper level of charge; (3) ascertaining the presence of any outstanding warrants or stop orders; and (4) evaluating the proper amount of bond and other conditions of pretrial release. (See trial testimony of James G. Piper, Vol. 5, May 30, 1986, 1:30 P.M., pages 2–9, regarding justification for detention during fingerprint clearance.)

(Defendant's Supplemental Trial Br. at 10.) That exact justification was presented to and rejected by the court in *Lively v. Cullinane*, 451 F.Supp. 1000, 1006 (D.D.C.1978):

> The Police Department has said that an arrestee must be fingerprinted so that if he gives a false name (1) the police may quickly determine his correct name for police and court records; and (2) the arrestee may be charged and arraigned for any crime noted on outstanding warrants, at the same time he is presented for the crimes for which he is being held presently. Lee Dep. at 31. About one in every ten offenders who is processed through fingerprinting and photographing has used a name different than his own, according to Officer Edward Dion. The correct names of these persons would still emerge if fingerprinting and photographing were carried out after presentment. In any case, the police department must make a stronger case for this step as a necessary administrative

procedure prior to presentment if it is to stand.

In *Lively*, the court held that detaining an arrestee for more than 90 minutes to take administrative steps necessary to process the arrest before presentment, including fingerprints, violated his Fourth Amendment rights. Although the City of Chicago seeks to distinguish *Lively* as an anomalous case in which the defendant allegedly "did not offer *any* opposing evidence that the time to process an arrestee should take no longer than one and a half hours" (Defendant's Supplemental Br. at 24 n. 5), that distinction is not persuasive given the fact that at least in *Lively* the defendant did offer some statistical evidence in an attempt to justify its procedures. By contrast, the City of Chicago did not bother to offer such evidence in this case. The very quotation cited immediately above is illustrative. In *Lively*, the defendant presented concrete evidence that "one in ten offenders who is processed though fingerprinting and photographing has used a name different than his own...." *Id.* No comparable evidence was produced in this case.[15]

One of the authors of the Chicago Police Department's fingerprint clearing policy, James Weaver, conceded that the Chicago Police Department audit showed that the only outstanding arrest warrants involved in the audit which had been found during the fingerprint clearing process were of persons who had been arrested on ordinance violation charges or on traffic warrants, charges for which fingerprinting was not even required. Most importantly, even though the City's most persuasive justification for the fingerprint clearing policy is that it ensures that those misdemeanor arrestees who are wanted on outstanding arrest warrants and who use false aliases are identified as such and apprehended before they are released on

---

**15.** Despite the fact that this Court posed direct questions to the City's expert in an attempt to elicit hard statistical evidence (*see, e.g.,* Tr. May 30, 1986 at 54–58), the City did not take the obvious suggestion that such evidence was desirable and yet lacking. Indeed, in response to the Court's inquiries, the City of Chicago presented, through Mr. Piper, only the hearsay evidence of the Chief Clerk of the First Municipal District of the Circuit Court of Cook County (Tr., June 2, 1986 at 3–11), and then objected to that evidence as irrelevant, immaterial, and hearsay when plaintiffs attempted to present the testimony of their expert, former assistant state's attorney James Cooley, in rebuttal (Tr., June 2, 1986 at 89–92)!

bond, the City produced no evidence of the number of arrestees who fall into this category. *See* Finding of Fact No. 18, above.

It is certainly true that numbers alone are not dispositive as to the reasonableness of the City of Chicago's fingerprint clearing policy. The quality of the City's law enforcement procedures is surely an important and relevant factor. For example, no one would quarrel that society is well-served by a law enforcement procedure which identifies a notorious and wanted mass murderer who uses false aliases upon arrest—be it on a misdemeanor or on a felony charge—and detains him until his identity and criminal history is certain.[16] (Defendant's Supplemental Br. at 11.) The question, however, is whether the benefit gained by the apprehension of such criminals is outweighed by the substantial invasion upon the Fourth Amendment rights of misdemeanor arrestees, particularly the 30% to 40% who have never been arrested before and who must wait the longest for Chicago's complex procedure to clear their fingerprints.

The City has provided no statistical evidence that its fingerprint clearing policy is justified by clearing outstanding arrest warrants on misdemeanor arrestees who give false identification, and thus the balance weighs heavily in favor of protecting the Fourth Amendment rights of individuals. Particularly given plaintiffs' extensive evidence regarding the availability to and use by the Chicago police of computerized data bases in the form of the hot desk computer system and the identification records computer system which can identify aliases, outstanding arrest warrants, and other pertinent information, and given the testimony of the City's police officers that these systems are adequate to uncover whether a person is sought on an outstanding arrest warrant, the absence of any significant, quantifiable benefit from detaining misdemeanor arrestees until their fingerprints clear renders the fingerprint clearing policy an unreasonable seizure under the Fourth Amendment.

The City of Chicago does not dispute that the *average* time for fingerprints to clear pursuant to its policy and procedures is between four to six hours. The Seventh Circuit recently has handed down a decision holding that a four hour period of post-arrest detention for the misdemeanor offense of shoplifting can constitute a viable fourth amendment claim if the police can not justify the need for such a detention. *Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432 (7th Cir.1986). The Seventh Circuit reversed the district court's entry of summary judgment on behalf of the defendants, including Chicago police officers, and remanded for further proceedings. In doing so, the court succinctly summarized its reasons as follows:

It is premature to say how long is too long under the fourth amendment. On remand the police should explain what must be done after an arrest for shoplifting and why reasonably diligent officers need more than four hours to do it. The court also should determine whether four hours is an acceptable period for a non-violent misdemeanor. *If the police choose to perform time-consuming tasks after an arrest, perhaps they must do so on their own time rather than the suspect's,* issuing a citation rather than keeping the suspect locked up in the interim.

*Id.* at 437; emphasis added.

The Seventh Circuit was persuaded by several factors in finding a possible fourth amendment claim for excessive detention. The police in *Gramenos* responded to the excessive detention claim incompletely and inadequately, as the City of Chicago responds in this case:

[T]he police respond to [the excessive detention claim] only by pointing out that they need to do a lot of things after an arrest—take fingerprints and mug shots, check for outstanding warrants, fill out countless forms. One difficulty is that none of the evidence in this case quanti-

---

**16.** *See United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 681, 83 L.Ed.2d 604 (1985), quoted *infra* at 334.

fies the amount of time it would take reasonably diligent officers to complete these tasks. Another is that there is some evidence that the police held Gramenos out of spite—or perhaps to impose the real punishment for shoplifting, see Malcolm M. Feeley, *The Process is the Punishment* (1979)—rather than out of a need to complete essential tasks. When Gramenos arrived at the stationhouse he asked to be released on bond. He states that officer Schmit replied: "Counsel, we are going to keep you here for four hours."

*Gramenos,* at 436–37. After recognizing that the Supreme Court has not yet spoken on how long the "brief period of detention to take the administrative steps incident to arrest" set forth in *Gerstein v. Pugh,* 420 U.S. at 113–14, 95 S.Ct. at 862–63, may be, the Seventh Circuit noted that the American Law Institute "thinks that two hours are enough" and that the Seventh Circuit itself had held in *Moore v. Marketplace Restaurant,* 754 F.2d 1336, 1350–52 (7th Cir.1985), that "four hours requires explanation." *Gramenos,* 797 F.2d at 437, *citing Model Code of Pre-Arraignment Procedure* § 130.2(1) (1975) and *Moore.*

Here, as in *Gramenos,* the average time which misdemeanor arrestees must wait for their fingerprints to clear is between four to six hours, and more than 10% of all misdemeanor arrestees must wait 10 hours or more for their fingerprints to clear. Here, as in *Gramenos,* the City either makes no attempt to justify or explain why it is necessary that its procedures take so long or it does so only by the meaningless and circular generalization that "good procedures" require that it be so. And here, as in *Gramenos,* given the low conviction rate of misdemeanor arrestees and given the miniscule number of convicted defendants who receive sentences of additional incarceration, this Court is distressed by the fact that for misdemeanor arrestees the "custodial arrest itself becomes a substantial part of the penalty." *Gramenos,* at 441. Indeed, here, *all* misdemeanor arrestees receive this penalty, the innocent as well as the guilty, and the penalty is imposed by the police well before the arres-

tees even appear before a judge or magistrate. The Fourth Amendment simply does not abide a procedure whereby the police both impose and execute punishment in the form of lengthy post-arrest detention and then present it to the judge as a *fait accompli.*

This Court is even more deeply concerned that the innocent—the vast majority of misdemeanor arrestees—are most seriously affected by the City's fingerprint clearing policy. The City's expert, as well as top level officials of the Chicago Police Department, conceded that those who must wait the longest for their prints to clear as a result of the checking and rechecking procedure by various grade level fingerprint technicians established by the clearing policy are those who have never been arrested before because those persons do not have their prints already on file at the Chicago Police Department. The obvious inference is that those misdemeanor arrestees who are least likely to pose a serious threat to society and are most probably innocent are precisely those who must suffer the longest and whose Fourth Amendment rights are most directly violated by the lengthy detentions engendered by the fingerprint clearing policy. This too the Fourth Amendment can not abide.

The City of Chicago contends that no court other than the *Lively* court has found a post-arrest detention for less than 24 hours to be unconstitutional, citing *Rodgers v. Lincoln Towing Service Inc.,* 771 F.2d 194 (7th Cir.1985); *Llaguno v. Mingey,* 763 F.2d 1560 (7th Cir.1985); *Fisher v. Washington Metropolitan Area Transit Authority,* 690 F.2d 1133 (4th Cir.1982); *Bernard v. City of Palo Alto,* 699 F.2d 1023 (9th Cir.1983); *Doe v. Thomas,* 604 F.Supp. 1508 (N.D.Ill.1985) (Bua, J.); *Uhler v. Gadoniski, et al.,* No. 85 C 4665 slip op. (N.D.Ill. April 27, 1986) (Leinenweber, J.); *Sanders v. City of Houston,* 543 F.Supp. 694 (S.D.Texas 1982), *aff'd,* 741 F.2d 1379 (5th Cir.1984); and *Dommer v. Hatcher,* 427 F.Supp. 1040 (N.D.Ind.1975), *rev'd in part on other grounds,* 653 F.2d 289 (7th Cir.1981).

None of those cases are directly applicable, however, because the courts in those cases did not consider the narrow issue presented here: i.e., whether misdemeanor arrestees capable of posting bond who are detained after fingerprinting solely in order that their fingerprints may clear are detained for unreasonably long periods of time in violation of their Fourth Amendment rights. The City itself recognizes that the fingerprint clearing process "is a subset of the total time of post-arrest detention" presented in all of these cases. (Defendant's Supplemental Br. at 13.) Moreover, most of these cases involved facts which indicated that the aggrieved individuals were detained for periods of time greatly exceeding 24 hours. The courts limiting such post-arrest detention to 24 hours before presentment to a magistrate did so in an attempt to accomodate legitimate law enforcement concerns with Fourth Amendment rights, but were nonetheless careful to point out that there was nothing magical about the 24 hour time limit and that individuals detained less than 24 hours might nevertheless state claims for constitutional violations.

In *Bernard v. City of Palo Alto*, 699 F.2d 1023 (9th Cir.1983), for example, the court viewed the "brief period of detention to take the administrative steps incident to arrest," *Gerstein*, 420 U.S. at 113, 95 S.Ct. at 863, as the time "required to book an arrestee." 699 F.2d at 1024. There, in upholding an injunction requiring a probable cause determination within 24 hours of a warrantless arrest absent exigent circumstances, the Ninth Circuit emphasized:

> The time fixed was not meant to define the constitutional right. Detention for less than 24 hours without a probable cause hearing would violate the Constitution in a particular case if the circumstances were such that the administrative steps leading to a magistrate's determination reasonably could have been completed in less than 24 hours.

*Id.* at 1025. The Fourth Circuit reached a similar result in *Fisher v. Washington Metropolitan Area Transit Authority*, 690 F.2d 1133 (4th Cir.1982):

> From [*Gerstein v. Pugh*, 420 U.S. at 113–14, 95 S.Ct. at 862–63] we must conclude that the Court considers that the reasonableness requirement of the fourth amendment does carry over past arrest to place limits of permissible duration upon this particular period of detention. The standard of reasonableness can only be that implied in the Court's observation that it is to be "brief" and, more specifically, that it is to be only that required "to take the administrative steps incident to arrest."

690 F.2d at 1140.

The City of Chicago heavily relies on the court's opinion in *Sanders v. City of Houston, supra*, in which the named plaintiffs were also arrested for misdemeanor charges and in which the court concluded that the "administrative steps" for arrest in the City of Houston as used in *Gerstein* "include more than transportation, booking, and filing charges," *Sanders*, 543 F.Supp. at 700, but that the Constitution nonetheless required presentment to a magistrate within 24 hours. The *Sanders* court made several references to cases construing Rule 5(a) of the Federal Rules of Criminal Procedure, which deals with post-arrest detention for federal offenses, because the Rule 5(a) standard closely parallels that articulated in *Gerstein*. 543 F.Supp. at 699. Rule 5(a) has been construed to allow various procedures to be completed before the accused is made available for bond. These procedures include questioning the suspect, *United States v. Brown*, 459 F.2d 319, 325 (5th Cir.1971), *cert. denied*, 409 U.S. 864, 93 S.Ct. 155, 34 L.Ed.2d 111 (1972); tracking down a co-defendant, *Rogers v. United States*, 330 F.2d 535, (5th Cir.1964), *cert. denied*, 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186 (1964); fingerprinting and photographing, *United States v. D'Argento*, 373 F.2d 307 (7th Cir. 1967), *cert. denied*, 389 U.S. 833, 88 S.Ct. 31, 19 L.Ed.2d 93 (1967); and checking the suspect's story or alibi, *United States v. Middleton*, 344 F.2d 78 (2d Cir.1965). Furthermore, it has been held that Rule 5(a) does not prohibit delay for a reasonable time after arrest in order to arrange for a witness to the crime to view the defendant

for identification purposes. *Young v. United States*, 435 F.2d 405 (D.C.Cir.1970). Therefore, the *Sanders* court acknowledged the propriety of these procedures as administrative steps incident to the arrests at issue, but concluded that in any event the arrestee may not be held longer than 24 hours. 543 F.Supp. at 705.

As the plaintiffs point out, however, the arrest procedures described for the City of Houston—namely, "fingerprinting, photographing, checking for prior record, laboratory testing, interrogating the suspect, verifying alibis, ascertaining similarities to other related crimes, and conducting lineups," *Sanders*, 543 F.Supp. at 700—are used rarely in misdemeanor cases in Chicago. Moreover, as the *Sanders* court took care to explain, "the determination of what constitutes 'extended' [detention period for necessary administrative steps] will vary with the circumstances." 543 F.Supp. at 701.

As the January, 1983 Chicago Police Department audit itself points out in this case, several major and correctable factors contribute to the lengthy delay for fingerprints to clear. First and most important, the audit concludes that "the overwhelming amount of detention time occurred between printing and charging, which includes the transmission of prints to the Identification Section, processing, and returning of results to the district of detention." (Plaintiffs' Ex. 11 at 2.) Over 45% of the prints received at the Identification Section via facsimile machine transmission were "bad" —i.e., unusable—and had to be retransmitted. (Plaintiffs' Ex. 11 at 8.) The facsimile machines used were 14 years old at the time, are still in use so far as this Court is aware, and were "no longer capable of producing high quality print copies on a consistent basis." *Id.* Despite the fact that over 3½ years have elapsed since that audit, the City of Chicago has apparently done nothing to replace these machines or

to change its procedure to reduce the time necessary for fingerprints to clear.[17] Second, the audit revealed that 9.1% of arrestees are fingerprinted when the offenses upon which they are arrested do not require that they be fingerprinted. Third, despite the fact that General Order 78–1 specifically provides for a procedure by which watch commanders of a district police station can waive awaiting the results of fingerprint checks, the audit results indicated that watch commanders did so in only 1.1% of all cases and recommended that the Department should "increase the number of fingerprint results that are waived enabling the prisoners to be charged in a shorter period of time." (Plaintiffs' Ex. 11 at 9.)

■ After examining all of the evidence and conducting the balance between legitimate law enforcement needs and the Fourth Amendment rights of individuals, this Court concludes that the fingerprint clearing policy of the City of Chicago unconstitutionally infringes upon the rights of misdemeanor arrestees to be released immediately upon posting of bail or to a prompt presentation to a judge or magistrate for a probable cause hearing. As the court stated in *Lively, supra:*

> The Police Department has argued that the delay in presenting arrestees is "reasonable" when one considers the other administrative and enforcement matters the police must handle each day. What defendants have failed to consider are the important liberty interests of the individual at stake in any pre-presentment detention. The individual is restricted in his physical movement and his ability to go to work or carry on his life. His reputation may be impugned even during a short detention. The interests of the police are not as significant during this post-arrest detention period. True, they must keep accurate records so that facts about the arrest and the alleged

---

17. Although the City presented evidence of its plan to implement the newly developed fingerprint identification computerized equipment, the City presented no evidence that that equipment will substantially reduce the total time for fingerprints to clear. To the contrary, the evidence indicates that no substantial reduction in time for clearing fingerprints will occur unless fingerprint transmittal methods are changed and unless the entire procedure is revamped. *See,* Finding of Fact Nos. 7, 15, and 16, above.

crime are preserved for the prosecuting attorney. The police also have an interest in keeping internal records. Without doubt they have an important interest in searching an individual so as to assure themselves he will not harm them. They also may restrict his movement so that he cannot destroy evidence. However, as soon as they fulfill these needs in an efficient way they cannot detain an individual any longer. At the point the police department finishes these administrative tasks, the Fourth Amendment intervenes so that they are holding an individual unconstitutionally until he · is presented to a magistrate.

451 F.Supp. at 1005–06.

At the same time, this Court does not wish to impose an arbitrary time limit beyond which a misdemeanor arrestee may not be held. Suffice it to hold that the fingerprint clearing policy as presently constituted is unconstitutional, that the plaintiffs are entitled to a declaratory judgment to that effect, and that the City of Chicago is permanently enjoined from continuing to follow it. Of course, this Court's holding today in no way prohibits the City of Chicago from continuing to take the fingerprints of any person lawfully arrested by the police. Nor does it prohibit the City or the police from conducting any of the "administrative steps" incident to the arrest that they deem appropriate. It merely forbids the police from detaining most misdemeanor arrestees for an unreasonable length of time solely so that their fingerprints may clear. This Court's holding is thus narrow and focused only on the fingerprint clearing process.

This Court must also consider how the class of plaintiffs to which this ruling applies is to be defined. It is clear that the original class definition proposed by the plaintiffs and certified by Judge Moran can not stand because the plaintiffs concede that the class should not include those misdemeanor arrestees who, because of their prior criminal history, may have misdemeanor charges upgraded to felonies. (Plaintiffs' Post-Trial Br. at 21 n. 19.) As the plaintiffs correctly point out, however, such offenses are the exception rather than the rule in the Illinois Criminal Code.

The City contends that there is no meaningful distinction between arrestees who have been charged with misdemeanors and those who have been charged with felonies:

The fact that the seizures in the present case were for fingerprint clearance on misdemeanor charges as opposed to felony charges is of no analytical consequence for fourth amendment considerations. In fact, any "treatment of [a detainee], whether or not it is technically characterized as an arrest, must be supported by probable cause". *Dunaway* [*v. State of New York*] *supra.*, 442 U.S. [200] at 214, 99 S.Ct. [2248] at 2264, 60 L.Ed.2d [824] at 837 [ (1979) ]. Thus, the type of charge does not control the right to detain for the incidents of an arrest. It is the presence of probable cause which dictates the right to detain for fingerprint processing here as in any other arrest.

(Defendant's Supplemental Tr. Br. at 6.) This Court today has rejected the City's attempt to confuse the police officer's on-the-scene assessment of probable cause with the constitutionally mandated probable cause assessment of an independent magistrate or judge, as did Judge Leighton in *Robinson, supra,* 638 F.Supp. at 192–193. Of course, should the City of Chicago desire to extend today's ruling to *all* arrestees, whether on felonies or on misdemeanors, the class definition could be modified accordingly. The Court suggests, however, that in fact there is a distinction between felony and misdemeanor offenses which the Supreme Court has recognized in Fourth Amendment cases:

Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible. The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes.

*United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 681, 83 L.Ed.2d 604 (1985).

 A trial court has the inherent power to modify or rescind interlocutory orders prior to final judgment, *Robinson v. City of Chicago,* 638 F.Supp. 186, 189–90 n. 5 (N.D.Ill.1986); *Peterson v. Hanson,* 569 F.Supp. 694, 695 (W.D.Wis.1983), and discretion to redefine and modify a class in a way which allows maintenance of an action as a class action, *Lively, supra,* 451 F.Supp. at 1003. Accordingly, to meet the concerns identified above, the Court has redefined the class as stated above in Conclusion of Law No. 5.

## CONCLUSION

Plaintiffs recognize that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Id.* The Fourth Amendment "permit[s] seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch." *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985). This Court finds that, as applied to the plaintiff class, the Chicago fingerprint clearing policy is not supported by "reasonable suspicion." Nor is the duration of post-arrest detention attributable to the fingerprint policy the "brief" period required for a *Terry* detention. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985).

Accordingly, this Court holds that the fingerprint clearing policy of the City of Chicago and the Chicago Police Department policy does not measure up to the minimum standards of the Fourth Amendment, and thus permanently enjoins the City of Chicago from continuing to detain class members while their fingerprints clear solely for that reason. The City and the plaintiffs are also ordered to submit within fourteen (14) days a proposed judgment order which embodies the declaratory and injunctive relief granted in this opinion and which would change the present processing procedures "so as to remedy the long, unnecessary and unconstitutional delays the court has found" in the post-arrest detention process due to the fingerprint clearing policy. *Lively, supra,* 451 F.Supp. at 1009.[18] Because the Court expects that this new policy will permit the police to detain those individuals for whom there exists a "quantum of individualized suspicion," *Delaware v. Prouse,* 440 U.S. 648, 654–55, 99 S.Ct. 1391, 1396–97, 59 L.Ed.2d 660 (1979), independent of probable cause to arrest, *see Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272–73 (7th Cir. 1983), the Court will retain jurisdiction to modify the injunction "with a rather free hand." *Alliance to End Repression v. Chicago,* 742 F.2d 1007, 1020 (7th Cir.1984).

It is so ordered.

## JUDGMENT ORDER

This action having been tried in this Court from May 23 to June 3, 1986, the Honorable Ilana Diamond Rovner presiding; this Court having rendered its Memorandum Opinion and Order with Findings of Fact and Conclusions of Law on August 25, 1985; and this Court having held that the fingerprint clearing policy of the City of Chicago as presently constituted and embodied in General Order 78–1 and as

---

**18.** In *Lively,* the court required the defendants to submit a proposed order to remedy the unconstitutional delays the court found "layered throughout the detention period prior to presentment." 451 F.Supp. at 1009. Particularly in light of the fact that Judge Leighton of this District has just recently struck down the City's extended detention policy as embodied in Section VI, Paragraph C–2 of General Order 78–1, by which the police could extend an arrestee's detention beyond the time he would normally be presented to a magistrate so that they could continue their investigation to build a case against the defendant while he languishes in jail, *Robinson, supra,* and given that this Court is now enjoining the fingerprint clearing policy embodied in General Order 78–1, the City of Chicago would be well-advised to examine that entire Order to ensure that its procedures meet Fourth Amendment requirements.

conducted by the Chicago Police Department is unconstitutional as violative of the Fourth Amendment rights of certain misdemeanor arrestees,

**IT IS ORDERED AND ADJUDGED AND DECREED AS FOLLOWS:**

1. RULE 54(b) FINDING: This judgment does not resolve all of the claims and issues in this case. The Court finds that there is no just reason to delay the entry of this decree, its enforcement, or any appeal taken therefrom, and accordingly, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, expressly directs the Clerk of the Court to enter this decree as a final judgment in favor of the plaintiff class, defined as:

> All persons who were arrested on other than a felony charge by a police officer of the City of Chicago on or after November 3, 1977, who had no reasonable probability of having charges against them elevated to a felony charge, and who were detained pursuant to the "fingerprint clearing" policy of the City of Chicago implemented in Police Department General Order 78–1.

and against defendant City of Chicago with respect to the claims of the parties adjudicated herein.

2. DECLARATORY JUDGMENT: This Court hereby declares that the fingerprint clearing policy of the City of Chicago as presently constituted and embodied in General Order 78–1 and as conducted by the Chicago Police Department is unconstitutional as violative of the Fourth Amendment rights of the class of misdemeanor arrestees defined above.

3. PROSPECTIVE INJUNCTIVE RELIEF: The defendant City of Chicago, its officers, agents, servants, employees, and all persons and organizations in active concert or participation with them are permanently enjoined from detaining a person arrested on a misdemeanor charge for fingerprint clearance, where there is no reasonable possibility of having such charges elevated to a felony, unless, on the basis of objective factors, there is a reasonable suspicion that the person is not whom he (or she) claims to be or that such person is wanted for other crimes. This discretion shall not extend to persons who voluntarily surrender to answer a misdemeanor warrant.

4. IMPLEMENTATION: Accordingly, the City of Chicago Police Department is directed to issue within sixty (60) days from the entry of this Judgment Order a General Order regarding fingerprint clearance of misdemeanor arrestees which is consistent with the prospective injunctive relief granted herein. Further, the General Order shall indicate that such detention shall not exceed a reasonable length of time.

Until such time as the City of Chicago presents to this Court a new regulation governing post-arrest detentions which is in accordance with the Court's rulings in this case, each time that a misdemeanor arrestee is held for fingerprint comparisons within the City of Chicago, a report shall be prepared and signed by the police official who made the decision to hold the arrestee for fingerprint comparison describing the specific factors which were deemed sufficient to warrant detention for the purpose of fingerprint comparison. Copies of these forms and the arrest reports shall be provided to plaintiff's counsel on a weekly basis. The Court specifically reserves jurisdiction to modify this procedure.